David K. Isom. (Utah Bar ID 4773)
ISOM LAW FIRM PLLC
1914 E. 9400 South
Suite 102
Sandy, UT 84093
Telephone: (801) 209-7400
Email: David@isomlawfirm.com
*Counsel for Plaintiffs and the Putative Class*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF UTAH**

| | |
|---|---|
| SHERI JOHNSTON, AUTUMN WIDDOES, SARA HURST, PHILIP WINTERS, LEZETTE RUSCH, and BRYANT THACKER, individually and on behalf of all others similarly situated, | **CIVIL ACTION NO.: 1:25-CV-00073-JNP-DAO** |
| Plaintiff, | **PROPOSED CLASS ACTION** |
| v. | |
| INTERMOUNTAIN HEALTHCARE, INC., THE BOARD OF DIRECTORS INTERMOUNTAIN HEALTHCARE, INC., THE INTERMOUNTAIN HEALTHCARE BENEFITS ADMINISTRATION COMMITTEE, and JOHN DOES 1-20, | |
| Defendants. | |

## AMENDED COMPLAINT[1]

Plaintiffs, Sheri Johnston, Autumn Widdoes, Sara Hurst, Philip Winters, Lezette Rusch, and Bryant Thacker ("Plaintiffs"), by and through their attorneys, on behalf of the Intermountain Healthcare Savings Plus 401(k) Plan (the "401(k) Plan") and the Intermountain Healthcare Tax Deferred Savings 403(b) Plan (the "403(b) Plan") (collectively, the 401(k) Plan and 403(b) Plan

[1] Plaintiffs file this Amended Complaint pursuant to FED. R. CIV. P. 15(a)(1)(B).

are referred to as the "Plans"),[2] themselves and all others similarly situated, state and allege as follows:

## I. INTRODUCTION

1. This is a class action brought pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1109 and 1132, against the Plans' fiduciaries, Intermountain Healthcare, Inc. ("Intermountain"), the Board of Directors of Intermountain Healthcare, Inc. (the "Board") and the Intermountain Healthcare Benefits Administration Committee (the "Committee") (collectively, Intermountain, the Board and the Committee are referred to as the "Defendants") for breaches of their fiduciary duties.

2. The Plans are defined contribution retirement plans, established pursuant to 29 U.S.C. § 1002(2)(A) and § 1002(34) of ERISA, that enable eligible participants to make tax-deferred contributions from their salaries to the Plans. *See* Intermountain Healthcare Savings Plus 401(k) Plan, 2012 Summary Plan Description ("SPD"), at 29 ("The Plan is a defined contribution plan that is a profit-sharing plan with a 401(k) component. The Plan is also intended to be an ERISA Section 404(c) plan within the meaning of 29 CFR Section 2550.404c-1."); *see also* Independent Auditor's Report ("Auditor's Report"), attached to 2023 Form 5500 for the 403(b) Plan, at 6 ("The Plan is a defined contribution plan established by Intermountain Health Care, Inc. (Intermountain) under the provisions of Section 403(b) of the Internal Revenue Code (the Code), which includes an elective contribution arrangement for the benefit of eligible employees of participating Intermountain subsidiaries.").

[2] The Plans are legal entities that can sue and be sued. ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plans are not a party. Rather, pursuant to ERISA § 409, and the law interpreting it, the relief requested in this action is for the benefit of the Plans and their participants.

3. To safeguard plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries. Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B).

4. The Tenth Circuit has recognized a fiduciary's stringent duties under ERISA:

> A central and fundamental obligation imposed on fiduciaries by ERISA is contained in Part 4, Title 1, § 404(a) [which] … embody a carefully tailored law of trusts, including the familiar requirements of undivided loyalty to beneficiaries, the prudent man rule, the rule requiring diversification of investments and the requirement that fiduciaries comply with the provisions of plan documents to the extent that they are not inconsistent with the Act.

*Eaves v. Penn*, 587 F.2d 453, 457 (10th Cir. 1978); *see also In re Williams Cos. ERISA Litig.*, 271 F. Supp. 2d 1328, 1341(N.D. Okla. 2003) (noting ERISA's fiduciary duties are the highest known to the law.)

5. The Department of Labor ("DOL") has also explicitly stated that employers are held to a "high standard of care and diligence" and must, among other duties, both "establish a prudent process for selecting investment options and service providers."[3]; *see also Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1823 (2015) ("*Tibble I*") (reaffirming the ongoing fiduciary duty to monitor a plan's investment options).

6. Under 29 U.S.C. § 1104(a)(1), a plan fiduciary must give substantial consideration to the cost of investment options. "Wasting beneficiaries' money is imprudent. In devising and

---

[3] *See* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, (Sept. 2019), at 2, available at https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (last visited July 24, 2024).

implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs." Uniform Prudent Investor Act (the "UPIA"), § 7.

7. "The Restatement … instructs that 'cost-conscious management is fundamental to prudence in the investment function,' and should be applied 'not only in making investments but also in monitoring and reviewing investments.'" *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197-98 (9th Cir. 2016) (*en banc*) (quoting Restatement (Third) of Trusts, § 90, cmt. b) ("*Tibble II*").

8. Because cost-conscious management is fundamental to prudence in the investment function the concept applies not only to investments, but to a fiduciary's obligation to continuously monitor all fees incurred by plan participants, including a plan's recordkeeping and administration fees ("RKA").

9. Additional fees of only 0.18% or 0.4% can have a large effect on a participant's investment results over time because "[b]eneficiaries subject to higher fees … lose not only money spent on higher fees, but also lost investment opportunity; that is, the money that the portion of their investment spent on unnecessary fees would have earned over time." *Tibble II*, 843 F.3d at 1198 ("It is beyond dispute that the higher the fees charged to a beneficiary, the more the beneficiary's investment shrinks.").

10. The Supreme Court recently reiterated that interpreting "ERISA's duty of prudence in light of the common law of trusts" a fiduciary "has a continuing duty of some kind to monitor investments and remove imprudent ones" and a plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones. *Hughes v. Northwestern Univ.*, 142 S. Ct. 737, 741 (2022).

11. Plaintiffs allege that during the putative Class Period, Defendants, as the "fiduciaries" of the Plans, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. §

1002(21)(A), breached the duties owed to the Plans, to Plaintiffs, and to the other participants of the Plans by, *inter alia*, failing to objectively and adequately review the Plans' investment portfolio, initially and on an ongoing basis, with due care to ensure that each investment option was prudent, in terms of performance.

12. At all times during the Class Period, the Plans had over three billion dollars in assets under management. At the start of the Class Period in 2019, the 401(k) Plan had $3,044,444,000 and the 403(b) Plan had $238,443,000 in assets under management. *See* 2019 Form 5500s for the 401(k) Plan and 403(b) Plan, Schedule H at 2. Collectively, the Plans had over $3.2 billion in assets under management in 2019.

13. By 2023, the 401(k) Plan had $6,014,924,000 and the 403(b) Plan had $309,616,000 in assets under management. *See* 2023 Form 5500s for the 401(k) Plan and 403(b) Plan, Schedule H at 2. Collectively, the Plans had over $6.3 billion in assets under management in 2023.

14. The Plans' assets under management qualifies them collectively as a jumbo plan in the defined contribution plan marketplace, and among the largest plans in the United States. In 2021, only 0.2 percent (1,011 of 641,747) of plans in the country had more than $1 billion in assets under management.[4] In addition, this was true at the start of the Class Period in 2019 where only 0.1 percent (776 of 603,217) of 401(k) plans in the country were as large as the Plans.[5]

15. As a jumbo plan, the Plans had substantial bargaining power regarding the fees and expenses that were charged against participants' investments.

---

[4] *See* The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at Plans, 2021 at Ex. 1.2, p. 7., available at https://www.ici.org/system/files/2024-08/24-ppr-dcplan-profile-401k.pdf.

[5] *See* The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans, 2019 at Ex. 1.2, p. 7, available at https://www.ici.org/system/files/2022-09/22-ppr-dcplan-profile-401k.pdf.

16. The Plans are also large in terms of the number of its participants. At the beginning of the Class Period, the 401(k) Plan had 43,082 participants and the 403(b) Plan had 4,741 participants. *See* Schedule H, attached to 2019 Form 5500s for the 401(k) Plan and 403(b) Plan, at 2. By 2023, the 401(k) Plan had 80,894 participants and the 403(b) Plan had 4,492 participants. *See* Schedule H, attached to 2023 Form 5500s for the 401(k) Plan and 403(b) Plan, at 2. Collectively, the Plans had 85,386 participants in 2023.

17. For comparison, according to information derived from ERISApedia.com's database, a service that compiles all Form 5500s filed with the Dept. of Labor ("DOL") by retirement plans, in 2020, there were only 123 defined contribution plans (401k, 401a, and 403b) in the country with over 50,000 participants with account balances. Additionally, there were only 54 retirement plans with between 40,000 and 49,999 participants.

18. When fiduciaries are tasked with caring for multiple plans with the same sponsor, they will bargain with providers using the aggregate of the plans' sizes, and can leverage the fact that the provider will be getting multiple sources of business from multiple plans.

19. Defendants caused the Plans to enter into an arrangement with T. Rowe Price Retirement Plan Services, Inc. ("TRP"), a party in interest, under which TRP received millions of dollars in exchange for recordkeeping services and trustee services rendered to the Plans. Defendants' conduct was especially egregious given that TRP received additional income from certain of the Plans' investment securities. This arrangement with TRP is a prohibited transaction because it "amounts to a 'direct or indirect ... furnishing of services ... between the plan and a party in interest,' 29 U.S.C. § 1106(a)(1)(C)." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 601 (8th Cir. 2009).

20. With regard to the Plans' investments, Defendants breached their fiduciary duty of prudence by selecting and/or maintaining a certain guaranteed investment contract ("GIC") in the Plans with lower crediting rate when compared to available similar or identical investments with higher crediting rates. The crediting rate is the guaranteed rate of return for the investment fund.

21. Specifically, Defendants allowed substantial assets in the Plans to be invested in the Plans' Principal Stability Fund ("Stability Fund"), "that consists of fully benefit-responsive synthetic guaranteed investment contracts (Synthetic GICs)." Auditor's Report, attached to the 2023 Form 5500 for the 401(k) Plan, at 10. The Stability Fund invested in synthetic GICs offered by Voya Retirement Insurance and Annuity Company ("Voya"), Pacific Life ("PacLife"), The Prudential Insurance Company of America ("Prudential"), Transamerica Life Insurance Company ("TransAm"), RGA Reinsurance Company ("RGA"), and Lincoln National Life Insurance Company ("Lincoln") (collectively, Voya, PacLife, Prudential, TransAm, RGA and Prudential are referred to as the "Insurance Companies"), that provided significantly lower rates of return than comparable stable value funds that Defendants could have made available to Plan participants.

22. A prudent fiduciary would not have included this underperforming investment option that also carried significantly more risk than other investment options that had similar goals, *i.e.,* preservation of investment assets.

23. The Insurance Companies benefited significantly from participants in the Plans investing in the Stability Fund. A prudent fiduciary who adequately monitored the Plans' investments and placed the interests of participants in the Plans above all would have recognized that the Stability Fund was benefitting the Insurance Companies at the expense of the participants in the Plans.

24. During the putative Class Period, Defendants, as the "fiduciaries" of the Plans, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duties owed to the Plans, to Plaintiffs, and to the other participants of the Plans by, *inter alia*: (1) failing to objectively and adequately review the Plans' investment portfolio with due care to ensure that each investment option was prudent, in terms of cost and performance; and (2) engaging in prohibited transactions in violation of 29 U.S.C. § 1106 (a)(1)(C).

25. Defendants' mismanagement of the Plans, to the detriment of participants and beneficiaries, constitutes a breach of the fiduciary duties of prudence, in violation of 29 U.S.C. § 1104. Their actions were contrary to actions of a reasonable fiduciary and cost the Plans and their participants millions of dollars.

26. Based on this conduct, Plaintiffs assert claims against Defendants for breach of the fiduciary duty of prudence (Count I), failure to monitor fiduciaries (Count II), and violation of ERISA's prohibited transactions (Count III).

## II. JURISDICTION AND VENUE

27. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001, *et seq*.

28. This Court has personal jurisdiction over Defendants because the Plans are administered in this District meaning Intermountain transacts business in this District, resides in this District, and/or has significant contacts with this District, and because ERISA provides for nationwide service of process.

29. Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District. Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because Intermountain does business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## III. PARTIES

### Plaintiffs

30. Sheri Johnston ("Johnston") resides in South Weber, Utah. During her employment, Plaintiff Johnston participated in the 401(k) Plan. Ms. Johnston invested in the Stability Fund in the 401(k) Plan and suffered injury to her Plan account due to the significant underperformance of the Stability Fund. In addition, Plaintiff Johnston also suffered injury to her Plan account by paying excessive RKA costs.

31. Autumn Widdoes ("Widdoes") resides in Henderson, Nevada. During her employment, Plaintiff Widdoes participated in the 401(k) Plan. Ms. Widdoes invested in the Stability Fund in the 401(k) Plan and suffered injury to her Plan account due to the significant underperformance of the Stability Fund. In addition, Plaintiff Widdoes also suffered injury to her Plan account by paying excessive RKA costs.

32. Sara Hurst ("Hurst") resides in Lindon, Utah. During her employment, Plaintiff Hurst participated in the 401(k) Plan. Ms. Hurst invested in the Stability Fund in the 401(k) Plan and suffered injury to her Plan account due to the significant underperformance of the Stability Fund. In addition, Plaintiff Hurst also suffered injury to her Plan account by paying excessive RKA costs.

33. Philip Winters ("Winters") resides in Sandy, Utah. During his employment, Plaintiff Winters participated in the 401(k) Plan and the 403(b) Plan. Mr. Winters invested in the Stability Fund in the 401(k) Plan and the 403(b) Plan and suffered injury to his Plan account due to the significant underperformance of the Stability Fund. In addition, Plaintiff Winters also suffered injury to his Plan account by paying excessive RKA costs.

34. Lezette Rusch ("Rusch") resides in Hooper, Utah. During her employment, Plaintiff Rusch participated in the 401(k) Plan. Ms. Rusch invested in the Stability Fund in the 401(k) Plan and suffered injury to her Plan account due to the significant underperformance of the Stability Fund. In addition, Plaintiff Rusch also suffered injury to her Plan account by paying excessive RKA costs.

35. Bryant Thacker ("Thacker") resides in Lehi, Utah. During his employment, Plaintiff Thacker participated in the 401(k) Plan. Mr. Thacker invested in the Stability Fund in the 401(k) Plan and suffered injury to his Plan account due to the significant underperformance of the Stability Fund. In addition, Plaintiff Thacker also suffered injury to his Plan account by paying excessive RKA costs.

36. Plaintiffs have standing to bring this action on behalf of the Plans because they participated in the Plans and were injured by Defendants' unlawful conduct. Plaintiffs are entitled to receive benefits in the amount of the difference between the value of their accounts currently, or as of the time their accounts were distributed, and what their accounts are or would have been worth, but for Defendants' breaches of fiduciary duties as described herein.

37. Further, each of the Plaintiffs have standing to bring this action on behalf of the Plans even if they only participated in one of the Plans because "[a]n individual in one ERISA benefit plan can represent a class of participants in numerous plans other than his own, if the

gravamen of the plaintiff's challenge is to the general practices which affect all of the plans." *Fallick v. Nationwide Mutual Ins. Co.,* 162 F.3d 410, 422 (6th Cir. 1998); *see also Dann v. Lincoln Natl. Corp.*, *et al.*, 708 F.Supp.2d 481, 487 (E.D. Pa. 2010); *Mulder v. PCS Health Sys., Inc.*, 216 F.R.D. 307, 317 (D.N.J. 2003) ("Mulder has standing to pursue his claims on behalf of members of other employee benefit plans included in the definition of the class.").

38. Here, the Plans were sponsored by the Company and administered in the same manner, including having TRP serve as the recordkeeper for both of the Plans and having the Stability Fund as an investment option.

39. Plaintiffs did not have knowledge of all material facts necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed.

**Defendants**

***Company Defendant***

40. Intermountain Healthcare, Inc. is the sponsor of the Plans and a named fiduciary of the Plans with a principal place of business at 36 S. State Street, Salt Lake City, Utah. *See* 2023 Form 5500s for the 401(k) Plan and 403(b) Plan, at 1. Intermountain "is the largest nonprofit health system in the Intermountain West."[6]

41. The Company is a plan sponsor and a fiduciary of the Plans, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A). *See* Plan Doc. at 6 ("'Intermountain Employer' shall mean the Plan Sponsor and any other entity who, with the authorization of the Plan Sponsor, may adopt this Plan."); *see also* Auditor's Report attached to 2023 Form 5500s for the 401(k) Plan and 403(b) Plan, at 6 ("Intermountain is the administrator and sponsor of the Plan.").

[6] *See* https://intermountainhealthcare.org/about, last accessed on May 22, 2025.

42. Through its Board, Intermountain appointed the Plans' Administrators. *See* Plan Doc. at 73 ("The Board of Directors of the Plan Sponsor shall appoint the Plan Administrator."). Under ERISA, fiduciaries with the power to appoint have a concomitant fiduciary duty to monitor and supervise their appointees.

***Board Defendants***

43. The Company acted through the Board to perform the Company's Plan-related fiduciary functions. As indicated above, the Board appointed the Intermountain Healthcare Benefits Administration Committee to serve as the Plan Administrator.

44. Accordingly, the Board had the fiduciary duty to monitor and supervise the Committee while it performed its fiduciary role.

45. Each member of the Board during the putative Class Period (referred to herein as John Does 1-10) is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), during the Class Period, because each exercised discretionary authority to appoint and/or monitor the Committee, which had control over Plan management and/or authority or control over management or disposition of Plan assets.

46. Members of the Board of Directors for Intermountain during the Class Period are collectively referred to herein as the "Board Defendants."

***Committee Defendants***

47. "The Intermountain Healthcare Benefits Administration Committee is the Plan Administrator. It is responsible for all aspects of the Plan except holding and investing the trust funds." SPD, at 28.

48. According to Plan documents, the Committee served as a Named Fiduciary of the Plans within the meaning of Section 402(a)(2) of ERISA. Included in the responsibilities of the

Committee regarding the administration of the Plan is the selection of appropriate investments for the Plans and its participants. *See* Plan Doc., at 85 ("In determining appropriate investments for the Plan the Plan Administrator shall establish and refer to a written investment policy.").

49. The Committee and each of its members were fiduciaries of the Plans during the Class Period, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each exercised discretionary authority over management or disposition of Plan assets.

50. The Committee and unnamed members of the Committee during the Class Period (referred to herein as John Does 11-20), are collectively referred to herein as the "Committee Defendants."

## IV. CLASS ACTION ALLEGATIONS[7]

51. Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of himself and the following proposed class ("Class"):

> All persons, except Defendants and any fiduciary of the Plans and their immediate family members, who were participants in or beneficiaries of the Intermountain Healthcare Savings Plus 401(k) Plan and/or the Intermountain Healthcare Tax Deferred Savings 403(b) Plan at any time between June 3, 2019 to the date of judgment (the "Class Period").[8]

52. The members of the Class are so numerous that joinder of all members is impractical. The 2023 401(k) Form 5500 lists 80,894 "participants with account balances as of the

[7] Although this is a proposed class action, the allegations in this complaint are alternatively pled in derivative fashion on behalf of the Plan because class certification is not necessarily required for Plaintiff to prosecute claims on behalf of the Plan and all participants. *See, e.g.*, *In re: Wilmington Trust Corp.,* 2013 WL 4757843, at *3 (D. Del. Sept. 4, 2013) (granting plaintiffs' motion to proceed derivatively on behalf of all plan participants without class certification, because of the nature of such claims). ERISA Section 502(a), 29 U.S.C. § 1132(a), authorizes pension plan participants to bring suit on behalf of a plan to recover losses to a plan.

[8] Plaintiff reserves his right to seek modification of the close of the Class Period in the event that further investigation/discovery reveals a more appropriate end period.

end of the plan year." 2023 401(k) Form 5500, at 2. The 2023 403(b) Form 5500 lists 4,492 "participants with account balances as of the end of the plan year." 2023 403(b) Form 5500, at 2.

53. Plaintiffs' claims are typical of the claims of the members of the Class. Like other Class members, Plaintiffs participated in the Plans and have suffered injuries as a result of Defendants' mismanagement of the Plans. Defendants treated Plaintiffs consistently with other Class members, and managed the Plans as a single entity. Plaintiffs' claims and the claims of all Class members arise out of the same conduct, policies, and practices of Defendants as alleged herein, and all members of the Class have been similarly affected by Defendants' wrongful conduct.

54. There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to:

A. Whether Defendants are/were fiduciaries of the Plans;

B. Whether Defendants breached their fiduciary duties of prudence by engaging in the conduct described herein;

C. Whether the Defendants failed to adequately monitor the Committee and other fiduciaries to ensure the Plans were being managed in compliance with ERISA;

D. The proper form of equitable and injunctive relief; and

E. The proper measure of monetary relief.

55. Plaintiffs will fairly and adequately represent the Class, and have retained counsel experienced and competent in the prosecution of ERISA class action litigation. Plaintiffs have no interests antagonistic to those of other members of the Class. Plaintiffs are committed to the

vigorous prosecution of this action, and anticipate no difficulty in the management of this litigation as a class action.

56. This action may be properly certified under Rule 23(b)(1). Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants. Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

57. In the alternative, certification under Rule 23(b)(2) is warranted because the Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## V. THE PLANS

### A. The 401(k) Plan

58. The 401(k) Plan is a "defined contribution plan that is a profit-sharing plan with a 401(k) component." SPD, at 29; *see also* Auditor's Report attached to 2023 401(k) Form 5500 ("The Plan is a defined contribution plan established by Intermountain Health Care, Inc. (Intermountain) under the provisions of Section 401(a) of the Internal Revenue Code (the Code).")

59. Employees are typically eligible to participate in the Plan after they reach the age of twenty-one. *See* SPD, at 3 ("A new qualified employee can become a participant in the Plan on the first day of the payroll period on or after the date the employee is at least age 21.")

60. Included in the 401(k) Plan's available funds was the Principal Stability Fund, which "is a proprietary fund of the Plan that consists of fully benefit-responsive synthetic guaranteed investment contracts (Synthetic GICs)." Auditor's Report, attached to 2023 401(k) Form 5500, at 10.

61. At the end of 2019, $280,500,000 in 401(k) Plan assets were invested in the Stability Fund. *See* Auditor's Report, attached to 2019 401(k) Form 5500, at 3.

62. By the end of 2023, over $301 million in 401(k) Plan assets were invested in the Stability Fund. *See* Auditor's Report, attached to 2023 401(k) Form 5500, at 4.

63. The chart below demonstrates the amount of 403(b) Plan assets invested in the Stability Fund during the Class Period.

| Plan Year | 401(k) Plan Assets in Stability Fund |
|---|---|
| 2019 | $280,500,000 |
| 2020 | $312,132,000 |
| 2021 | $309,550,000 |
| 2022 | $305,444,000 |
| 2023 | $301,568,000 |

### B. The 403(b) Plan

64. The 403(b) Plan "is a defined contribution plan established by Intermountain Health Care, Inc. (Intermountain) under the provisions of Section 403(b) of the Internal Revenue Code (the Code)." *See* Auditor's Report, attached to 2023 403(b) Form 5500, at 6.

## VI. THE TOTALITY OF THE CIRCUMSTANCES DEMONSTRATES THAT DEFENDANTS FAILED TO ADMINISTER THE PLAN IN A PRUDENT MANNER

### A. ERISA Fiduciaries Are Held to the Highest Standards Regarding Process and Methodology of Evaluating Investments

65. As described in the "Parties" section above, Defendants were fiduciaries of the Plans.

66. ERISA "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (quotation omitted). In addition to a duty to select prudent investments, under ERISA, a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent ones" that exist "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble I*, 135 S. Ct. at 1828; *see also Hughes*, 142 S. Ct. at 741.

67. As stated by the DOL: ERISA "requires plan fiduciaries, when selecting and monitoring service providers and plan investments, to act prudently and solely in the interest of the plan's participants and beneficiaries. Responsible plan fiduciaries also must ensure that arrangements with their service providers are 'reasonable' and that only 'reasonable' compensation is paid for services. …" DOL 408(b)(2) Regulation Fact Sheet.

68. The duty "…to act solely in the best interest of participants has been a key tenet of ERISA since its passage." "Best Practices for Plan Fiduciaries," at 36, published by Vanguard, 2019.[9]

69. Acting in the sole interest of plan participants is all encompassing. A fiduciary must monitor all investment options in a 401(k) plan as a prudent investment professional. *See* the U.S. Department of Labor, Employee Benefits Security Administration (EBSA)'s "Meeting Your Fiduciary Responsibilities," at 2 ("The duty to act prudently is one of a fiduciary's central responsibilities under ERISA. It requires expertise in a variety of areas, such as investments."),

[9] Available at https://institutional.vanguard.com/iam/pdf/FBPBK.pdf?cbdForceDomain.

available at https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/publications/meeting-your-fiduciary-responsibilities.pdf.

70. A prudent investment professional, and hence a fiduciary, must regularly evaluate a fund's performance history, the portfolio manager's experience and tenure, changes to the fund's investment strategy, changes to the underlying assets in the investment, total assets under management within the fund, fees, and other relevant factors.

71. With respect to investment returns, diligent investment professionals monitor the performance of their selected investments using appropriate industry-recognized "benchmarks" and prudently managed equivalents.

72. The measurement of investments against prudently managed alternatives is critical given that these alternatives represent other investments available to a plan, which may increase the likelihood that participants reach/live their preferred lifestyle in retirement.

73. Whether a plan fiduciary enlists the assistance of an investment manager, consultant, or advisor, the plan's fiduciaries are not relieved of fiduciary liability for selecting and monitoring the plan's investment options.

74. It is black letter law that a fiduciary's duty to conduct an "independent investigation into the merits of a particular investment," is the "most basic of ERISA's investment fiduciary duties." *In re Unisys Savings Plan Litigation*, 74 F.3d 420, 435 (3d Circ. 1996). *Hughes*, 142 S. Ct. at 738 (noting ERISA fiduciaries are required to "conduct their own independent evaluation to determine which investments may by prudently included in the plan's menu of options.").

75. It may also indicate a lack of adequate care and attention to ignore sound advice provided by investment advisors.

76. To the extent plan fiduciaries have adopted an investment policy statement, those fiduciaries "must comply with the plan's written statements of investment policy, insofar as those written statements are consistent with the provisions of ERISA." *Lauderdale v. NFP Retirement, Inc.*, 2022 WL 17260510, at * 10 (S.D. Cal. Nov. 17, 2022). That is, the investment policy statement must be written with the sole interest of the plan participant in mind.

77. Plaintiffs did not have and do not have actual knowledge of the specifics of Defendants' decision-making process with respect to the Plans, including Defendants' processes (and execution of such) for selecting, monitoring, and removing the Plans' investments and fees because this information is solely within the possession of Defendants prior to discovery. *See Braden*, 588 F.3d 585 at 598 ("If Plaintiffs cannot state a claim without pleading facts which tend systematically to be in the sole possession of defendants, the remedial scheme of [ERISA] will fail, and the crucial rights secured by ERISA will suffer.").

78. In fact, in an attempt to discover the details of the Plan's mismanagement, Plaintiffs first wrote to the Plan administrator on February 28, 2023 to request, among other things, "all written instruments" governing or pertaining to the Plan, including "Investment Policy Statements, and amendments, exhibits, or appendices thereto[,]" "Investment Management Contracts, or other instruments under which the Plan was established or operated, and all amendments, exhibits, or appendices thereto," and "Recordkeeping and other vendor services agreements" and as well as any committee's meeting minutes. This request was made pursuant to Section 104(b)(4) of ERISA.

79. Plaintiffs sent a follow up letter on March 23, 2023, which reattached the original request and reminded Defendants that "the documents requested must be produced within thirty (30) days of a request."

80. By letter dated May 2, 2023, the Plan's administrator responded to Plaintiffs' request refusing to provide documents pertaining to "procedures adopted by the Plan, the Plan's investment committee or any predecessor thereto governing any aspect of the management or operation of the Plan or any Trust holding the Plan's assets, or the investment of the Plan's assets;" "Minutes of any meetings of the Plan's investment committee, or other governing entity of the Plan (and all committees and subcommittees thereof) including all exhibits, attachments, and documents referenced in the minutes[,]" and "Documents evidencing any delegation of fiduciary responsibilities." The letter also refused to provide "Recordkeeping and other vendor services agreements" that Plaintiffs requested.

81. Reviewing meeting minutes, when they exist, is the bare minimum needed to peek into a fiduciary's monitoring process. But in most cases, even that is not sufficient. For, "[w]hile the absence of a deliberative process may be enough to demonstrate imprudence, the presence of a deliberative process does not … suffice in every case to demonstrate prudence. Deliberative processes can vary in quality or can be followed in bad faith. In assessing whether a fiduciary fulfilled her duty of prudence, we ask 'whether a fiduciary employed the *appropriate* methods to investigate and determine the merits of a particular investment,' not merely whether there were any methods whatsoever." *Sacerdote v. New York Univ.*, 9 F.4th 95, 111 (2d Cir. 2021) (emphasis in original).

82. For the purposes of this Complaint, Plaintiffs have drawn reasonable inferences regarding these processes and methods based upon several factors as described below.

83. Defendants' breaches of their fiduciary duties, relating to their overall decision-making, resulted in, *inter alia*, the selection (and maintenance) of the Stability Fund in the Plans

throughout the Class Period that wasted the assets of the Plans and the assets of participants because of unnecessary costs and underperformance.

### B. Defendants Breached Their Fiduciary Duties by Causing the Plans to Offer the Stability Fund

#### 1. Overview of GICs

84. For defined-contribution retirement plans, stable value investments are intended to provide participants with an option that protects their assets and is shielded from risks of loss, hence why they are called Guaranteed Investment Contracts or GICs.

85. GICs are issued by insurance companies in the form of a fixed annuity contract. Pursuant to the terms of those contracts, the GICs provide for a guaranteed rate of return or "crediting rate" during a specified period and guarantee the principle of the contract.

86. Historically, stable value funds have higher returns than money market funds, in part because preservation of principle is not their sole objective.

87. There are several different types of stable value investments in the retirement plan marketplace. Large plans often offer "synthetic" stable value funds, which are the least risky in theory, because principal is guaranteed by multiple "wrap providers" and the fund owns the assets of the underlying funds.

88. Separate account products, where the assets of the underlying funds are held in the separate account of an insurance carrier are riskier, because there is only one "wrap" provider. For separate account GICs, the insurer's payment obligations are putatively backed by a separate account, which is less susceptible to claims and liabilities against the insurer. As a result, separate account GICs offer higher crediting rates, generally speaking.

89. Collective Investment Trusts "pool the assets of multiple plans together, enabling smaller plans to gain access to stable value" and the same rates as larger plans.

https://www.metlife.com/retirement-and-income-solutions/stable-value/everything-you-need-to-know/ CITs "are subject to the oversight of state banking regulators or the Office of the Comptroller of the Currency" making them very safe. *Id*.

90. And General account products, where the funds are held unrestricted in the general account of the insurance carrier, are the riskiest type of stable value funds, because they are more vulnerable to single entity credit risk and are riskier than separate account GICs. Consequently, general account GICs offer the highest rates in theory.

91. Because the funds are kept in unrestricted accounts, they are generally subject to claims and liabilities asserted against the insurer. Such funds are subject to single entity credit risk, meaning the insurer is the sole entity responsible for paying such funds. If the insurer fails to pay funds, no other entity will satisfy the loan.

92. However, when the insurance carrier is the same company as the plan sponsor, such as some of the below comparisons, they are comparable to synthetic stable value funds because the company owns the assets. The risk of the company failing to meet the contract terms as an insurance carrier is theoretically the same risk as the company failing to meet the contract terms as a plan sponsor (*e.g*., bankruptcy).

93. However, the reality following the Great Financial Crisis ("GFC") of 2008-2009, is that stable value funds, regardless of type, are all heavily regulated by state insurance laws, banking laws when applicable, and ERISA's duty of prudence that necessitates the investigation into the service provider's creditworthiness. The heightened level of oversight and lessons learned by insurance carriers and banks from the GFC have proven effective, as the market circumstance of COVID-19 did not result in the same disasters for stable value funds as experienced during the GFC.

94. Likewise, the reality is that the number of wrap providers in a GIC is a distinction without a difference in terms of risk, particularly for the comparator GICs below, who all have creditworthy insurance carriers.

95. It also makes little difference to participants whether the plan or the insurance carriers own the underlying assets, as the principle is guaranteed regardless, especially in fully benefit-responsive plans. It also does not affect the potential for achieving better rates.

**2. The Plans' Inclusion of the Stability Fund**

96. At all relevant times, Defendants maintained the authority to exercise control over the Plans' investments, including the Plans' Stability Fund.

97. "The interest rate is reviewed monthly for resetting per the contract." Auditor's Report, attached to the 2022 Form 5500 for the 401(k) Plan, at note 2.[10]

98. Under this term, a prudent fiduciary should be aware of the rates and prevailing marketplace on at least a "monthly" basis.

99. The Form 5500s Auditor's Notes state as follows:

> The Principal Stability Fund is a proprietary fund of the Plan that consists of **fully benefit-responsive** synthetic guaranteed investment contracts (Synthetic GICs).
>
> […]
>
> ***Synthetic GICs simulate the performance of traditional guaranteed investment contracts*** through the use of commingled trust funds, short-term investment funds and benefit-responsive wrapper contracts issued by insurance companies to provide market and cash flow protection at stated interest rates. **The Synthetic**

[10] *See also* Auditor's Report, attached to the 2020 Form 5500 for the 401(k) Plan, Schedule H, Line 4i; Auditor's Report, attached to the 2021 Form 5500 for the 401(k) Plan, Schedule H, Line 4i; Auditor's Report, attached to the 2022 Form 5500 for the 401(k) Plan, Schedule H, Line 4i.

> **GICs do not permit the insurance companies to terminate the agreements prior to the scheduled maturity dates.**[11]

100. Fully benefit-responsive means that the participants can initiate transactions, such as withdrawals, at book value without adjustment.

101. The Auditor's Notes also state:

> **Certain events may limit the ability of the Plan to transact at the contract value of Synthetic GICs with the issuer.** Such events include the following: (a) amendments to the plan document including complete or partial plan termination or merger with another plan; (b) changes to the Plan's prohibition on competing investment options or the deletion of equity wash provisions; (c) bankruptcy of the plan sponsor or other plan sponsor events (e.g., divestitures or spin-offs of a subsidiary) that cause a significant withdrawal from the Plan; or (d) the failure of the trust to qualify for exemption from federal income taxes or any prohibited transaction exemption under ERISA. ***Management does not believe that the occurrence of such events is probable***.[12]

102. For these reasons, the Stability Fund's crediting rates can be compared to traditional GICs, commingled trust funds also called collective investment trusts, fixed annuity contracts, and other stable value funds or GICs whose terms are: (1) fully benefit-responsive, (2) do not permit the insurance companies to terminate the agreements before the end of the contract, (3) whose rates are reviewed regularly, and (4) whose contracts are with creditworthy insurance carriers. The Stability Fund's crediting rates can be also compared to GICs in plans whose managers do not believe that there are any events that are likely to limit the ability of the plan to transact at the

---

[11] *See* Auditor's Report, attached to the 2019 Form 5500 for the 401(k) Plan, at Note 2 (emphasis added); Auditor's Report, attached to the 2020 Form 5500 for the 401(k) Plan, at Note 2; Auditor's Report, attached to the 2021 Form 5500 for the 401(k) Plan, at Note 2; Auditor's Report, attached to the 2022 Form 5500 for the 401(k) Plan, at Note 2; Auditor's Report, attached to the 2023 Form 5500 for the 401(k) Plan, at Note 2.

[12] *See id.,* n. 10.

contract value like the Stability Fund, therein making risk considerations equivalent. The Comparator GICs below meet these requirements.

### 3. There are Many GICs in the Marketplace with Competitive Crediting Rates

103. The marketplace for GICs is robust with many insurance companies offering GICs with competitive rates.

104. Throughout the Class Period, identical or substantially identical stable value funds with higher crediting rates were available to the Plans but were not selected by Defendants.

105. These comparisons include:

- The Pomona Valley Hospital Medical Center Retirement Savings Plan's fully benefit-responsive synthetic GIC, where multiple "traditional investment contracts held by the Plan are guaranteed investment contracts" with multiple "contract issuers." *See* Auditor's Report, attached to the 2023 Form 5500 for the Pomona Valley Hospital Medical Center Retirement Savings Plan, at Note E. "The crediting rates are reviewed quarterly" and, like the Stability Fund, "the contracts cannot be terminated before the scheduled maturity date." *Id.* Also like the Stability Fund, "[n]o events are probable of occurring that might limit the ability of the Plan to transact at contract value." *Id.*

- The Baylor College of Medicine Retirement Plan offered a "fully benefit-responsive investment contract" that is "fully and unconditionally guaranteed by Lincoln National Life Insurance Company" – the same carrier used in the Stability Fund. Also like the Stability Fund, the "The Plan Administrator believes that any events that would limit the Plan's ability to transact at contract value are remote." *See* Auditor's Report, attached to the 2020 Form 5500 for the Baylor College of Medicine Retirement Plan, at Note 5.

- The Gemba Group Annuity Plan_offered a synthetic GIC with multiple underlying "guaranteed investment contracts[,]" and the GIC cannot be cancelled "before the scheduled maturity dates." Auditor's Report, attached to the 2021 Form 5500 for the Gemba Group Annuity Plan, at Note 4; *see also id.*, at Line 4i (listing the insurance companies). Also like the Stability Fund, "The Plan administrator believes that any events that would limit the Plan's ability to transact at contract value with participants are probable of not occurring." *Id.* The Gemba Group Annuity Plan also has a "guaranteed fixed interest fund" which is also a Synthetic GIC because it has multiple "underlying fully benefit-responsive contracts" and, like the Stability Fund, "The Plan administrator believes that any events that would

limit the Plan's ability to transact at contract value with participants are probable of not occurring." *Id.*, at Note 5.

- The Holzer Health System 401(a) Profit Sharing Plan offered a Common collective trust, with multiple "underlying investments (consisting of guaranteed investment contracts, security-backed contracts and common collective trusts)" like the Stability Fund. Auditor's Report, attached to the 2021 Form 5500 for the Holzer Health System 401(a) Profit Sharing Plan, at Note 3. "[T]he NAV of the fund is determined daily" and the "[u]nits are issued and redeemed" daily. *Id*. Hence, it was fully benefit-responsive. The assets are listed as assets of the plan. *Id*., at Schedule H. Again, the Stability Fund's underlying GICs include collective trusts.

- The Jackson National Life Insurance Company Defined Contribution Plan_offered a fully benefit-responsive investment contract that was a "Company-sponsored" annuity "exclusively designed for use in connection with the Plan" and is "backed by the creditworthiness of the Company." *See* Auditor's Report, attached to the 2022 Form 5500 for the Jackson National Life Insurance Company Defined Contribution Plan, at Note 3. The Company (Jackson National Life Insurance Company) is the plan sponsor. Also, the crediting rate is "based on current market rates[,]" not risk. *Id*.

- The Transamerica 401(k) Retirement Savings Plan offered a fully benefit-responsive GIC with Transamerica Financial Life Insurance Company ("TFLIC"), an affiliate of the plan sponsor, Transamerica Corporation. The GIC "consists of stable fund segments" with each segment have "a guaranteed rate of interest" like a Synthetic GIC. Auditor's Report, attached to the 2019 Form 5500 for the Transamerica 401(k) Retirement Savings Plan, at page 9. The interest rate is determined quarterly. *Id*., at 10. Like the Stability Fund, "[t]he Company does not believe that the occurrence of any such events that would limit the Plan's ability to transact at contract value with participants is probable." *Id*., at 11. "TFLIC is not permitted to pay or transfer the value of the contract, without consent from the Plan, prior to the scheduled maturity date." *Id*.

- The Valley Children's Hospital Defined Contribution Retirement Plan offered "a fully benefit-responsive investment contract with Lincoln National Life Insurance Company." Auditor's Report, attached to the 2023 Form 5500 for the Valley Children's Hospital Defined Contribution Retirement Plan, at Note 4. "The guarantee is based on Lincoln's ability to meet its financial obligations from the general assets of Lincoln" *id*., which is nonetheless comparable to the Stability Fund because Lincon National was the same carrier as one of the underlying GICs in the Stability Fund. "The Plan administrator does not believe that any events that would limit the Plan's ability to transact at contract value with participants are probable of occurring." *Id*.

- The HCC Insurance Holdings Inc. 401(k) Plan offered a fully benefit responsive guaranteed investment contract where the "interest rates are reviewed on a quarterly

basis for resetting" and, like the Stability Fund, "The Plan administrator does not believe that the occurrence of any such event, which would limit the Plan's ability to transact at contract value with participants, is probable." Auditor's Report, attached to the 2019 Form 5500 for the HCC Insurance Holdings Inc. 401(k) Plan, at Note 4. The assets of the HCC insurance GIC are Plan assets, albeit held by MassMutual. *Id.*, at Schedule H.

- The American United Life Progress Sharing Plan and Trust offered a "fully benefit-responsive fixed interest investment option with the Company" that "is maintained in the Company's general account" where the rates are "determined quarterly." Auditor's Report, attached to the 2020 Form 5500 for the American United Life Progress Sharing Plan and Trust, at Note 2. The insurance carrier is/was also the plan sponsor. Also, like the Stability Fund, "[t]he Plan Administrator does not believe the occurrence of any such value event, which would limit the Plan's ability to transact at contract value with participants, is probable." *Id.*

- The Allina 401k Retirement Savings Plan offered a "traditional fully benefit-responsive guaranteed investment contract." Auditor's Report, attached to the 2022 Form 5500 for the Allina 401k Retirement Savings Plan, at Note 5. "The crediting rate is reviewed on a quarterly basis for resetting[,]" and, like the Stability Fund, the contract did "not permit the insurance compan[y] to terminate the agreements prior to the scheduled maturity date." *Id.* Also like the Stability Fund, "No events are probable of occurring that might limit the ability of the Plan to transact at contract value." *Id.* Although "the insurance companies maintain the contributions in general accounts[,]" *id.*, the assets are listed as plan assets. *Id.*, at Schedule H.

- The Auto-Owners Insurance Company Retirement Savings Plan offered "a fully benefit-responsive investment contract with Auto-Owners Life Insurance Company (AOLIC), a wholly owned subsidiary of Auto-Owners Insurance Company." Auditor's Report, attached to the 2023 Form 5500 for the Auto-Owners Insurance Company Retirement Savings Plan, at Note 3. Like the Stability Fund, "The plan administrator does not believe" that any events that "would limit the Plan's ability to transact at contract value" "is probable", and "The guaranteed investment contract does not permit the insurance company to terminate the agreement prior to the scheduled maturity date." *Id.*

- The International Imaging Materials Inc. Retirement and Investment Plan offered a "traditional fully benefit-responsive investment contract[]" carried by Lincoln National Life Insurance Co., who also carries one of the underlying GICs in the Stability Fund. Auditor's Report, attached to the 2022 Form 5500 for the International Imaging Materials Inc. Retirement and Investment Plan, at Note 2. The crediting rates are determined "quarterly" and, like the Stability Fund, "there are no events that limit the ability of the Plan to transact at contract value with the issuers." *Id.* Although "Lincoln Insurance maintain[s] the contributions in a general account fund" it is listed as plant assets. *Id.*, at Note 2 and Schedule H. Rates are based on "factors, including economic and market conditions, the general interest

rate environment and the expected and actual return on the portfolio within the general account[,]" not risk. *Id*. What Lincoln deemed reflective of the "economic and market conditions" should be the same for the Stability Fund during the same "economic and market conditions."

- The Mattel, Inc. Personal Investment Plan offered a fully benefit-responsive "traditional GIC" where "the contract itself is owned by the Plan." Auditor's Report, attached to the 2023 Form 5500 for the Mattel, Inc. Personal Investment Plan, at Note 3. "The Plan's administrator does not believe that the occurrence of any such event, which would limit the Plan's ability to transact at contract value with participants, is probable" and "Mattel is unaware of any events which occurred during 2023 that would allow contract issuers to terminate the contracts held by the Plan." *Id.*

- The Trugreen Profit Sharing and Retirement Plan offered a "a traditional fully benefit-responsive guaranteed investment contract." Auditor's Report, attached to the 2021 Form 5500 for the Trugreen Profit Sharing and Retirement Plan, at Note 4. "The crediting rate is reviewed on a quarterly or semiannual basis for resetting. The guaranteed investment contract does not permit the insurance company to terminate the agreement prior to the scheduled maturity date." *Id*. "No events are probable of occurring that might limit the ability of the Plan to transact at contract value." *Id*. Although "MassMutual maintains the contributions in a general account[,]" *id*., the assets are listed as plan assets. *Id*., at Note 4, Schedule H.

106. The Stability Fund in the Plans had underwhelming crediting rates when compared to GICs provided by the same or comparable carriers for other retirement plans:

| Year | Plan Name[13] | No. of Participants | Plan Assets | Insurance Carrier | Crediting Rate[14] |
|---|---|---|---|---|---|
| **2019** | Baylor College of Medicine Retirement Plan | 12,587 | $1,278,730,175 | Lincoln National Life Insurance Company | 4.29% |
| | Jackson National Life Insurance Company Defined | 5,002 | $1,090,110,381 | Jackson National Life Insurance | 4.28% |

[13] "*" signifies the use of the same insurance carrier as a GIC underlying the Stability Fund.

[14] For crediting rates not specifically identified in the plans' Form 5500s, the calculated yield is interest credited divided by the end of year balance. Some Form 5500s listed a range or average yield, but Plaintiffs were able to calculate precise crediting rates within the stated range.

| | | | | | |
|---|---|---|---|---|---|
| | Contribution Plan | | | | |
| | Holzer Health System 401(a) Profit Sharing Plan | 1,896 | $179,609,420 | American United Life Insurance Company | 3.98% |
| | Transamerica 401(k) Retirement Savings Plan* | 15,140 | $2,020,965,905 | Transamerica Financial Life Insurance Company (but multiple underlying contracts) | 3.85% |
| | American United Life Progress Sharing Plan and Trust | 3,051 | $377,919,056 | American United Life Insurance Company | 3.70% |
| | HCC Insurance Holdings Inc. 401(k) Plan | 2,515 | $355,957,124 | Massachusetts Mutual Life Insurance Company | 3.56% |
| | **The Intermountain Plans** | **47,823** | **$3,282,887,000** | **RGA**<br>**Voya**<br>**TransAm**<br>**PacLife**<br>**Prudential** | **2.49%**<br>**2.82%**<br>**2.58%**<br>**2.36%**<br>**2.57%** |
| | | | | | |
| 2020 | Baylor College of Medicine Retirement Plan* | 12,905 | $1,493,377,139 | Lincoln National Life Insurance Company | 4.16% |
| | Allina 401k Retirement Savings Plan | 32,203 | $2,690,046,457 | Brighthouse Life Insurance Company | 3.72% |
| | HCC Insurance Holdings Inc. 401(k) Plan | 2,711 | $428,308,461 | Massachusetts Mutual Life Insurance Company | 3.56% |
| | American United Life Progress Sharing Plan and Trust | 2,699 | $435,970,029 | American United Life Insurance Company | 3.54% |
| | **The Intermountain Plans** | **51,276** | **$3,965,807,000** | **RGA**<br>**Voya**<br>**TransAm**<br>**PacLife** | **2.18%**<br>**1.96%**<br>**2.61%**<br>**2.35%** |

| | | | | | |
|---|---|---|---|---|---|
| | | | | **Prudential** | **2.18%** |
| | | | | **Lincoln** | **2.26%** |
| | | | | | |
| 2021 | Gemba Group Annuity Plan | 969 | $118,565,852 | National Ohio Financial Services | 4.97% |
| | Baylor College of Medicine Retirement Plan* | 13,391 | $1,692,013,731 | Lincoln National Life Insurance Co | 4.23% |
| | Holzer Health System 401(a) Profit Sharing Plan | 2,017 | $203,815,263 | American United Life Insurance Company | 4.02% |
| | American United Life Progress Sharing Plan and Trust | 3,183 | $493,267,284 | American United Life Insurance Company | 3.87% |
| | Gemba Group Annuity Plan | 969 | $118,565,852 | Principal Life Insurance Company | 3.84% |
| | **The Intermountain Plans** | **56,816** | **$4,513,316,000** | **RGA** | **1.51%** |
| | | | | **Voya** | **1.77%** |
| | | | | **TransAm** | **1.61%** |
| | | | | **PacLife** | **1.34%** |
| | | | | **Prudential** | **1.73%** |
| | | | | **Lincoln** | **1.51%** |
| | | | | | |
| 2022 | International Imaging Materials Inc. Retirement and Investment Plan* | 445 | $59,443,888 | Lincoln National Life Insurance Co. | 4.89% |
| | Baylor College of Medicine Retirement Plan* | 14,036 | $1,434,738,254 | Lincoln National Life Insurance Co. | 4.37% |
| | American United Life Progress Sharing Plan and Trust | 3,235 | $439,262,320 | American United Life Insurance Company | 3.90% |

| | | | | | |
|---|---|---|---|---|---|
| | Jackson National Life Insurance Company Defined Contribution Plan | 4,650 | $1,149,061,601 | Jackson National Life Insurance | 3.83% |
| | Allina 401k Retirement Savings Plan | 34,554 | $2,678,277,538 | Brighthouse Life Insurance Company | 3.69% |
| | Trugreen Profit Sharing and Retirement Plan | 11,408 | $371,495,784 | Massachusetts Mutual Life Insurance Company | 3.67% |
| | **The Intermountain Plans** | **65,369** | **$3,855,968,000** | **RGA** | **1.81%** |
| | | | | **Voya** | **1.82%** |
| | | | | **TransAm** | **1.84%** |
| | | | | **PacLife** | **1.63%** |
| | | | | **Prudential** | **1.80%** |
| | | | | **Lincoln** | **1.74%** |
| | | | | | |
| 2023 | <u>The Valley</u> Children's Hospital Defined Contribution Retirement Plan * | 4,282 | $550,230,744 | Lincoln National Life Insurance Co. | 4.57% |
| | Mattel, Inc. Personal Investment Plan | 7,427 | $1,167,576,000 | Metropolitan Tower Life Insurance Co. | 3.71% |
| | Pomona Valley Hospital Medical Center Retirement Savings Plan* | 4,219 | $525,201,271 | Lincoln National Life Insurance Co. | 3.64% |
| | Auto-Owners Insurance Company Retirement Savings Plan | 8,582 | $772,874,102 | Auto-Owners Life Insurance Company | 3.48% |
| | | **85,386** | **$6,324,540,000** | **RGA** | **2.71%** |
| | | | | **Voya** | **2.70%** |

| | | | | | |
|---|---|---|---|---|---|
| | **The Intermountain Plans** | | | **TransAm** | **2.70%** |
| | | | | **PacLife** | **2.74%** |
| | | | | **Prudential** | **2.72%** |
| | | | | **Lincoln** | **2.57%** |

107. Throughout the Class Period, the Stability Fund in the Plans underperformed the comparator funds by an average of almost 45%, as demonstrated in the table below.

| **Year** | **Stability Fund Rate of Return in the Plans** | **Comparator Average Rate of Return** | **Stability Fund Percentage of Underperformance in the Plans** |
|---|---|---|---|
| 2019 | 2.56% | 3.94% | 35.03% |
| 2020 | 2.26% | 3.75% | 39.73% |
| 2021 | 1.58% | 4.19% | 62.29% |
| 2022 | 1.77% | 4.06% | 56.40% |
| 2023 | 2.69% | 3.85% | 30.13% |
| Average Underperformance during Class Period | | | 44.72% |

108. Notably, in 2021 the Stability Fund's crediting rate *decreased* while the Comparator GIC's crediting rates *increased,* indicating Defendants' failure to adequately investigate the prevailing marketplace and achieve similar adjustments in the same economy. Subsequent increases were still insufficient to bring the crediting rates in line with the prevailing marketplace and meaningful returns.

109. The dramatic disparities between crediting rates in all years demonstrates that any purported difference in GIC type or theoretical risk cannot be the reason for the Stability Fund's dismal crediting rate.

110. Again, specific Comparator GICs used herein all had similar risk considerations based on their terms, the creditworthiness of their insurance carriers, and the fact that their plan administrators did not believe it probable that any plan or sponsor event would limit the ability of the plans to transact at contract value. Indeed, many of the Comparator GICs had the same insurance carriers as the Stability Fund. The Comparator GICs were all fully benefit-responsive and their crediting rates were all regularly reviewed in the same prevailing marketplace and economic circumstances as the Stability Fund.

111. The Stability Fund should be achieving at least the same "performance of traditional guaranteed investment contracts." Auditor's Report, attached to the 2019 Form 5500 for the 401(k) Plan, at Note 2.

112. In short, because the Plans held between $3.2 billion and $6.3 billion combined in assets under management throughout the Class Period, they had considerable leverage to bargain for higher crediting rates under the same or better circumstances.

113. A prudent fiduciary would have known that other providers of fixed annuities offer substantially identical, better-performing stable value investments. A prudent fiduciary could have accomplished this goal by demanding higher crediting rates from the Insurance Companies and/or by submitting requests for proposals to the Insurance Companies and other providers of stable value investments

### C. Defendants Committed a Prohibited Transaction Resulting in Excessive RKA costs for the Plan and its Participants

114. During the Class Period, Defendants entered into a contract with TRP to provide RKA services to the Plans. However, such an engagement is a prohibited transaction under ERISA.

115. 29 U.S.C. §§ 1106(a)(1)(C) provides that "(1) A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction

constitutes a direct or indirect … (C) furnishing of goods, services, or facilities between the plan and a party in interest."

116. Here, TRP was a party in interest to the Plans as it was receiving compensation for RKA services, as well as indirect compensation from the Plans in the form of revenue share being paid to TRP from TRP funds in the Plan.

**1. Costs for Recordkeeping Services Vary Little Between Competing Providers for a Plan with a Substantial Number of Participants**

117. The term "recordkeeping" is a catchall term for the suite of administrative services typically provided to a defined contribution plan by the plan's "recordkeeper." Recordkeeping and administrative services fees are one and the same and the terms are used synonymously herein and referred to as RKA.

118. There are two types of essential recordkeeping services provided by all national recordkeepers for large plans with substantial bargaining power (like the Plan). First, an overall suite of recordkeeping services is provided to large plans as part of a "bundled" fee for a buffet style level of service (meaning that the services are provided, in retirement industry parlance, on an "all-you-can-eat" basis), including, but not limited to, the following services:

A. Basic account recordkeeping (e.g. demographic, source, investment and vesting records);

B. Multi-channel participant and plan sponsor access (e.g. phone, web);

C. Daily participant transaction accounting (e.g., purchases, redemptions, exchanges);

D. Payroll service (e.g. hardships, in-service withdrawals, termination distributions);

E. Participant tax reporting services (e.g., IRS Form 1099-R);

F. Participant confirmations, statements, and standard notices;

G. Plan-level reporting and annual financial package (excluding IRS Form 5500);

H. Participant education (e.g. newsletters, web articles, standard communication materials);

I. Plan consulting (e.g., preapproved document services, operational materials);

J. Plan consulting (e.g. preapproved document services, operational compliance support).

119. This suite of essential recordkeeping services can be referred to as "Bundled" services. These services are offered by all recordkeepers for one price (typically at a per capita price), regardless of the services chosen or utilized by the plan. As explained in more detail below, the services chosen by a large plan do not affect the amount charged by recordkeepers for such basic and fungible services.

120. The second type of essential recordkeeping services, hereafter referred to as "A La Carte" services, provided by all national recordkeepers, often has separate, additional fees based on the conduct of individual participants and the usage of the services by individual participants. These fees are distinct from the bundled arrangement described above to ensure that one participant is not forced to help another cover the cost of, for example, taking a loan from their plan account balance. These A La Carte services typically include, but are not limited to, the following:

a. Loan processing;

b. Brokerage services/account maintenance (if offered by the plan);

c. Distribution services; and

d. Processing of qualified domestic relations orders.

121. All national recordkeepers have the capability to provide all of the aforementioned recordkeeping services at very little cost to all large defined contribution plans, including those much smaller than the Plans. In fact, several of the services, such as managed account services, self-directed brokerage, Qualified Domestic Relations Order processing, and loan processing are often a profit center for recordkeepers.

122. The cost of providing recordkeeping services depends in large part on the number of participants in a plan. Plans with large numbers of participants can take advantage of economies of scale by negotiating a lower per-participant recordkeeping fee. *See* 1998 DOL Study,[15] at 4.2.2. ("Basic per-participant administrative charges typically reflect minimum charges and sliding scales that substantially reduce per capita costs as plan size increases."). When more participants in a plan are on a recordkeeping platform, the recordkeeper allocates its fixed costs over a larger participant base, which reduces the per-participant cost. As a result, the cost to add a new participant to a plan is relatively low. And as the overall number of participants increases, the average cost per participant decreases. ***Because recordkeeping expenses are driven by the number of participants in a plan, the vast majority of plans are charged on a per-participant basis.***[16]

---

[15] https://www.dol.gov/sites/dolgov/files/EBSA/researchers/analysis/retirement/study-of-401k-plan-fees-and-expenses.pdf ("1998 DOL Study").

[16] "[T]he actual cost of administrative services is more dependent on the number of participants in the plan." There is no "logical or practical correlation between an increase in administrative fees and an increase in plan assets." Hewitt Associates, LLC, *Be a Responsible Fiduciary: Ask the Right Questions About 401(k) Plan Fees*, Oct. 2008; *see also* Mercer Investment Consulting, Inc., *DC Fee Management – Mitigating Fiduciary Risk and Maximizing Plan Performance* (2013), https://www.mercer.com/content/dam/mercer/.

123. In general, the level, number and character of participant services provided by the recordkeeper have minimal impact upon the costs of providing recordkeeping. That is because building and maintaining a robust, intuitive, web-based participant interactive 401(k) account system incurs large fixed costs. Each additional participant placed on the system causes a minimal incremental/marginal cost to the record keeper ***notwithstanding the level, number and character of the services provided to that additional participant.***

124. Recordkeepers for large 401(k) plans such as Fidelity, Vanguard, Empower, and Voya, among others, invest in technology infrastructure necessary to provide recordkeeping and transaction services to all clients (*e.g.*, website, call center, and some print services).

125. Accordingly, a plan sponsor or fiduciary has the leverage to negotiate favorable rates given that costs of implementation do not change for the service provider.

**2. The Plans' Recordkeeping Fees were Excessive**

126. Because recordkeeping costs are not affected by account size, prudent fiduciaries of defined contribution plans negotiate recordkeeping fees as a fixed dollar amount rather than as a percentage of assets. *See* Mercer Best Practices at 3. Otherwise, as plan assets grow, the recordkeeping compensation increases without any change in the recordkeeping services, leading to unreasonable fees.

127. As demonstrated in the charts below, the Plans' participants were saddled with above-market administrative and recordkeeping fees throughout the Class Period.

128. The Plans' per participant RKA fees were as follows:

| 401(k) Plan | | | |
|---|---|---|---|
| **Plan Year** | **Participants** | **Total RKA Reported** | **$PP** |
| 2019 | 43,082 | 1,606,000 | $37.28 |
| 2020 | 46,497 | $1,548,000 | $33.29 |

| | | | |
|---|---|---|---|
| 2021 | 52,051 | $1,794,000 | $34.47 |
| 2022 | 60,554 | $2,038,000 | $33.66 |
| 2023 | 80,894 | $2,770,000 | $34.24 |

| **403(b) Plan** | | | |
|---|---|---|---|
| **Plan Year** | **Participants** | **Total RKA Reported** | **$PP** |
| 2019 | 4,741 | $164,000 | $34.59 |
| 2020 | 4,779 | $163,000 | $34.11 |
| 2021 | 4,765 | $162,000 | $34.00 |
| 2022 | 4,815 | $162,000 | $33.64 |
| 2023 | 4,492 | $161,000 | $35.84 |

129. Looking at recordkeeping costs for plans similar in size to the combined assets and participant size of the Plans during the Class Period shows that the Plans were paying higher recordkeeping fees than their peers.

| **Recordkeeper** | **Plan Name** | **Plan Year** | **Assets Under Management** | **Participants** | **Schedule C Codes** | **Indirect Compensation** | **Cost Per Participant[17]** |
|---|---|---|---|---|---|---|---|
| T. Rowe Price | Thermo Fisher Scientific Inc. 401(k) Retirement Plan | 2019 | $5,675,354,000 | 42,339 | 15 21 25 28 33 37 38 49 50 52 55 59 62 64 65 | Yes - $0 | $9 |
| Great-West Life | Deseret 401(k) Plan | 2019 | $4,264,113,298 | 34,938 | 64 | Yes - $0 | $22 |
| Fidelity | The Dow Chemical Company Employees' Savings Plan | 2019 | $10,913,979,302 | 37,868 | 37 50 64 60 65 | Yes - $0 | $25 |
| Vanguard/ Prudential | Philips North America 401(k) Plan | 2019 | $4,898,009,752 | 28,428 | 15 37 50 65 99 | Yes - $0 | $25 |

[17] Unless otherwise noted, these fees are taken from the Form 5500.

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **TRP** | **The Intermountain Plans** | **2019** | **$3,282,887,000** | **47,823** | 15 21 25 28 33 37 38 49 50 52 55 59 62 64 65 71 | **Yes - $0** | **$37 – 401(k)**<br>**$34 – 403(b)** |
| | | | | | | | |
| Vanguard | FedEx Office and Print Services, Inc. 401(k) Retirement Savings Plan | 2020 | $1,051,387,744 | 19,354 | 15, 25, 50, 16, 26, 52, 21, 37, 57 | Yes - $0 | $23 |
| T. Rowe Price | Thermo Fisher Scientific Inc. 401(k) Retirement Plan | 2020 | $6,618,601,000 | 43,691 | 15 21 25 28 37 38 49 50 52 59 62 64 65 99 | Yes - $0 | $25 |
| Prudential | Philips North America 401(k) Plan | 2020 | $5,663,746,665 | 28,348 | 15 37 50 65 99 | Yes - $0 | $25 |
| Fidelity | Sutter Health 403(b) Savings Plan | 2020 | $5,564,538,096 | 67,149 | 37 60 64 65 | Yes - $0 | $26 |
| **TRP** | **The Intermountain Plans** | **2020** | **$3,965,807,000** | **51,276** | 15 21 25 28 33 37 38 49 50 52 55 59 62 64 65 71 | **Yes - $0** | **$33 – 401(k)**<br>**$34 – 403(b)** |
| | | | | | | | |
| T. Rowe Price | Thermo Fisher Scientific Inc. 401(k) Retirement Plan | 2021 | $7,716,713,000 | 51,276 | 15 21 25 28 33 37 38 49 50 52 55 59 62 64 65 | Yes - $0 | $13 |
| Fidelity | Sutter Health 403(b) Savings Plan | 2021 | $6,372,464,202 | 66,814 | 37 60 64 65 71 | Yes - $0 | $25 |
| Prudential | Philips North America 401(k) Plan | 2021 | $6,384,324,582 | 30,245 | 15 37 50 65 99 | Yes - $0 | $25 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Fidelity | The Tax Sheltered Annuity Plan of Texas Children's Hospital | 2021 | $1,706,447,554 | 15,788 | 37, 60, 64, 65, 71 | Yes - $0 | $26 |
| Fidelity | Optumcare Management, LLC 401(k) Retirement Savings Plan | 2021 | $1,341,037,601 | 10,170 | 37, 60, 64, 65, 71 | Yes - $0 | $28 |
| **TRP** | **The Intermountain Plans** | **2021** | **$4,513,316,000** | **56,816** | 15 21 25 28 33 37 38 49 50 52 59 62 64 65 | **Yes - $0** | **$34 – 401(k)**<br>**$34 – 403(b)** |
| | | | | | | | |
| T. Rowe Price | Thermo Fisher Scientific Inc. 401(k) Retirement Plan | 2022 | $6,601,217,000 | 55,419 | 15 21 25 28 33 37 38 49 50 52 55 59 62 64 65 | Yes - $0 | $13 |
| Fidelity | Danaher Corporation & Subsidiaries Savings Plan | 2022 | $5,870,072,827 | 43,386 | 37 64 65 71 | Yes - $0 | $22 |
| Fidelity | Sutter Health 403(b) Savings Plan | 2022 | $5,315,577,972 | 67,449 | 37 60 64 65 71 | Yes - $0 | $25 |
| Prudential | Philips North America 401(k) Plan | 2022 | $5,180,251,859 | 30,811 | 15 37 50 65 99 | Yes - $0 | $26 |
| Fidelity | The Tax Sheltered Annuity Plan of Texas Children's Hospital | 2022 | $1,475,238,032 | 16,973 | 37, 60, 64, 65, 71 | Yes - $0 | $29 |
| **TRP** | **The Intermountain Plans** | **2022** | **$3,855,968,000** | **65,369** | 15 21 25 28 33 37 38 49 50 52 55 59 62 64 65 71 | **Yes - $0** | **$34 – 401(k)**<br>**$34 – 403(b)** |
| | | | | | | | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Fidelity | The Dow Chemical Company Employees' Savings Plan | 2023 | $10,073,680,220 | 33,196 | 37 50 64 60 65 16 | Yes - $0 | $9 |
| T. Rowe Price | Thermo Fisher Scientific Inc. 401(k) Retirement Plan | 2023 | $7,509,872,000 | 55,419 | 15 21 25 28 33 37 38 49 50 52 55 59 62 64 65 | Yes - $0 | $18 |
| Fidelity | Danaher Corporation & Subsidiaries Savings Plan | 2023 | $5,808,822,663 | 37,647 | 37 64 65 71 | Yes - $0 | $20 |
| Fidelity | Sutter Health 403(b) Savings Plan | 2023 | $6,529,632,096 | 71,322 | 37 60 64 65 71 | Yes - $0 | $24 |
| Prudential | Philips North America 401(k) Plan | 2023 | $5,779,286,156 | 29,489 | 15 37 50 65 99 | Yes - $0 | $27 |
| T. Rowe Price | Sanofi U.S. Group Savings Plan | 2023 | $7,800,386,450 | 26,698 | 15 37 49 | Yes - $0 | $27 |
| **TRP** | **The Intermountain Plans** | **2023** | **$6,324,540,000** | **85,386** | 15 21 25 28 37 38 49 50 52 59 62 64 65 | **Yes - $0** | **$34 – 401(k)**<br>**$36 – 403(b)** |

130. The above chart demonstrates that for similar plans, regarding assets and participants, the Plans had one of the highest recordkeeping fees over the course of the Class Period.

131. As of the end of 2021 there were only 1,011 (0.2%) 401(k) plans with more than $1 billion in plan assets. *See* https://www.ici.org/system/files/2023-09/23-rpt-dcplan-profile-401k.pdf. The 401(k) Plan's $34 per participant fee from 2019 to 2023 is 35% greater than the average fee of $22 per participant from 2019 to 2023 for the twenty-four (24) plans listed above.

132. This vast discrepancy between the Plans' RKA fees and comparable plans existed for all years from 2019 through 2023. Indeed, the figures in the above chart are just an example of the Plans' excessive RKA fees from 2019 through 2023.

133. The Plans should have been able to obtain per participant recordkeeping fees of no more than $22 per participant, and likely even less. This fee is consistent with the average recordkeeping fees paid by similar plans in the country as demonstrated in the allegations above.

134. Further, because TRP was a party-in-interest and received income from the funds it maintained in the Plans, the Plans' fiduciaries should have taken these additional sources of income into consideration to reduce the excessive RKA fees paid to TRP.

135. Given the size of the Plans' assets during the Class Period and total number of participants, in addition to the general trend towards lower recordkeeping expenses in the marketplace as a whole, the Plans could have obtained recordkeeping services that were comparable to or superior to the typical services provided by the Plans' recordkeeper at a lower cost.

136. For the foregoing reasons, Defendants' violation of ERISA's prohibited transactions resulted in the Plans' participants paying excessive RKA fees.

**COUNT I**
**Breaches of Fiduciary Duty of Prudence**
**(against the Committee)**

137. Plaintiffs re-allege and incorporates herein by reference all prior allegations in this Complaint as if fully set forth herein.

138. At all relevant times, the Committee and its members ("Prudence Defendants") were fiduciaries of the Plans within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A),

in that it exercised discretionary authority or control over the administration and/or management of the Plans or disposition of the Plans' assets.

139. As fiduciaries of the Plans, the Prudence Defendants were subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a). These fiduciary duties included managing the assets of the Plans for the sole and exclusive benefit of Plans' participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

140. The Prudence Defendants breached these fiduciary duties in multiple respects as discussed throughout this Complaint. Prudence Defendants did not make decisions regarding the Plans' investment lineup based solely on the merits of each investment and what was in the interest of Plans' participants. Instead, the Prudence Defendants selected and retained investment options in the Plans despite poor performance in relation to other comparable investments.

141. As a direct and proximate result of the breaches of fiduciary duties alleged herein related to the GICs, the Plans suffered millions of dollars of losses due to excessive costs and lower net investment returns. Had Prudence Defendants complied with their fiduciary obligations, the Plans would not have suffered these losses, and the Plans' participants would have had more money available to them for their retirement.

142. Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Prudence Defendants are liable to restore to the Plans all losses caused by their breaches of fiduciary duties, and also must restore any profits resulting from such breaches. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in their Prayer for Relief.

143. The Prudence Defendants knowingly participated in each breach, knowing that such acts were a breach, and failed to make any reasonable and timely effort under the circumstances to remedy the breaches.

**COUNT II**
**Failure to Adequately Monitor Other Fiduciaries**
**(against the Company and the Board)**

144. Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

145. Intermountain, through its Board (the "Monitoring Defendants") had the authority to appoint and remove members of the Committee, and the duty to monitor the Committee and were aware that the Committee had critical responsibilities as fiduciaries of the Plans.

146. In light of this authority, the Monitoring Defendants had a duty to monitor the Committee to ensure that the Committee was adequately performing its fiduciary obligations, and to take prompt and effective action to protect the Plans in the event that the Committee was not fulfilling those duties.

147. The Monitoring Defendants also had a duty to ensure that the members of the Committee possessed the needed qualifications and experience to carry out their duties; had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plans' investments; and reported regularly to the Company.

148. The Monitoring Defendants breached their fiduciary monitoring duties by, among other things, failing to monitor and evaluate the performance of the Committee or have a system in place for doing so, standing idly by as the Plans suffered significant losses as a result of the Committee's imprudent actions and omissions.

149. As a consequence of the foregoing breaches of the duty to monitor, the Plans suffered millions of dollars in losses. Had the Monitoring Defendants complied with their fiduciary obligations, the Plans would not have suffered these losses, and the Plans' participants would have had more money available to them for their retirement.

150. Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Monitoring Defendants are liable to restore to the Plans all losses caused by their failure to adequately monitor the Committee. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in their Prayer for Relief.

**COUNT III**
**Prohibited Transactions**
**(Against All Defendants)**

151. Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

152. ERISA § 406(a)(1), 29 U.S.C. § 1106(a)(1), provides, in pertinent part, that "a fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect . . . (C) furnishing of goods, services, or facilities between the plan and a party in interest; [or] (D) transfer to, or use by or for the benefit of, a party in interest, of any assets of the plan and a party in interest."

153. ERISA § 3(14), 29 U.S.C. § 1002(14), defines a "party in interest" to include (A) "any fiduciary . . . of such employee benefit plan;" (B) "a person providing services to such plan;" (C) "an employer any of whose employees are covered by such plan," and "(H) any employee, officer, or director of such employer."

154. ERISA § 3(9), 29 U.S.C. § 1002(9) defines "person" as "an individual, partnership, joint venture, corporation, mutual company, joint-stock company, trust, estate, unincorporated organization, association, or employee organization."

155. Defendants' decision to agree to pay excessive fees to TRP as recordkeeper for the Plans amounted to a direct or indirect "furnishing of goods, services, or facilities between the plan and a party in interest" pursuant to ERISA § 406(a)(1)(C) and the "transfer to, or use by or for the benefit of a party in interest, of any assets of the plan" pursuant to ERISA § 406(a)(1)(D).

156. Pursuant to 29 U.S.C. § 1109(a) and 1132(a)(2), Defendants, as fiduciaries to the Plans, are liable to restore to the Plans all losses caused by their violations of ERISA §§ 406(a)(1)(C) and (D).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that judgment be entered against Defendants on all claims and requests that the Court awards the following relief:

A. A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(2) of the Federal Rules of Civil Procedure;

B. Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C. A Declaration that the Defendants have breached their fiduciary duties under ERISA;

D. An Order compelling the Defendants to make good to the Plans all losses to the Plans resulting from Defendants' breaches of their fiduciary duties, including losses to the Plans resulting from imprudent investment of the Plans' assets, and to restore to the Plans all profits the

Defendants made through use of the Plans' assets, and to restore to the Plans all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

E. An order requiring the Company to disgorge all profits received from, or in respect of, the Plans, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of a constructive trust, as necessary to effectuate said relief, and to prevent the Defendants' unjust enrichment;

F. Actual damages in the amount of any losses the Plans suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G. An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

H. Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plans and removal of Plan fiduciaries deemed to have breached their fiduciary duties;

I. An award of pre-judgment interest;

J. An award of costs pursuant to 29 U.S.C. § 1132(g);

K. An award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

L. Such other and further relief as the Court deems equitable and just.

Dated: August 25, 2025

Respectfully submitted,

*/s/ Mark K. Gyandoh*

**CAPOZZI ADLER, P.C.**
Mark K. Gyandoh, Esquire
James A. Maro, Esquire
312 Old Lancaster Road
Merion Station, PA 19066

Email: markg@capozziadler.com
jamesm@capozziadler.com
Tel.: (610) 890-0200
Fax: (717) 232-3080

David K. Isom. (Utah 4773)
**ISOM LAW FIRM PLLC** ;
1914 E. 9400 South
Sandy, UT 84093
Tel: (801) 209-7400
Email: David@isomlawfirm.com

*Counsel for Plaintiffs and the Putative Class*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 25, 2025, a true and correct copy of the foregoing document was filed with the Court utilizing its ECF system, which will send notice of such filing to all counsel of record.

By: *<u>/s/ Mark K. Gyandoh</u>*
Mark K. Gyandoh, Esq.