David Castleberry (USB # 11531)
*david.castleberry@ogletreedeakins.com*
OGLETREE DEAKINS
15 West South Temple Street, Suite 950
Salt Lake City, UT 84101
Telephone: 801-658-6160

Richard J. Pearl (*pro hac vice*)
*rick.pearl@faegredrinker.com*
FAEGRE DRINKER BIDDLE & REATH LLP
320 S. Canal Street., Suite 3300
Chicago, IL 60606
Telephone: 312-213-0056

Allison S. Egan (*pro hac vice*)
*allison.egan@faegredrinker.com*
FAEGRE DRINKER BIDDLE & REATH LLP
One Logan Square, Suite 2000
Philadelphia, PA 19103
Telephone: 215-988-1982

*Attorneys for Defendants*

## IN THE UNITED STATES DISTRICT COURT IN AND FOR
## THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| SHERI JOHNSTON, *et al.*,<br><br>    Plaintiffs,<br><br>vs.<br><br>INTERMOUNTAIN HEALTHCARE, INC., *et al.*,<br><br>    Defendants. | Case No. 1:25-CV-00073-JNP-DAO<br><br>**DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT**<br><br>Judge Jill N. Parrish<br><br>Magistrate Judge Daphne A. Oberg |

## TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................ 1

II.   PLAINTIFFS' ALLEGATIONS ......................................................................... 5

    A.   The Intermountain 401(k) and 403(b) Plans .............................................. 5

    B.   The Plans' Investments and the Principal Stability Fund .......................... 5

    C.   The Plans' Recordkeeping Fees ................................................................. 8

    D.   Plaintiffs' Claims ....................................................................................... 9

III.  ARGUMENT .................................................................................................... 10

    A.   Plaintiffs Fail to State a Plausible Claim for Breach of the Duty of Prudence ................................................................................................... 10

        1.   12(b)(6) Legal Standards ................................................................ 10

        2.   The Retention of the Principal Stability Fund Does Not Raise an Inference of Imprudence ................................................................ 11

            a.   *Key Principles Regarding Imprudent Investment Claims* ...................... 11

            b.   *The Stability Fund and the Comparators Have Fundamentally Different Risks, Rewards, and Investment Goals* .................................... 13

            c.   *New Allegations Added to the AC are Red Herrings* ............................. 14

        3.   Recordkeeping Fees Paid to TRP Do Not Raise an Inference of Imprudence ..................................................................................... 17

    B.   Plaintiffs Fail to State a Claim Premised on a Prohibited Transaction ..................... 22

    C.   Plaintiffs' Derivative Duty to Monitor Claims Fails ............................... 25

IV.   CONCLUSION ................................................................................................. 25

**TABLE OF AUTHORITIES**

**Cases**                                                                                                           **Page(s)**

*AGI Consulting L.L.C., by Al-Assaf v. Am. Nat'l Ins. Co.*,
  378 F. Supp. 3d 1056 (W.D. Okla. 2019), *aff'd sub nom. AGI Consulting
  L.L.C. v. Am. Nat'l Ins. Co.*, 798 F. App'x 296 (10th Cir. 2020) ...........................................24

*Albert v. Oshkosh Corp.*,
  47 F.4th 570 (7th Cir. 2022) ......................................................................................19

*Anderson v. Intel Corp. Inv. Pol'y Comm.*,
  137 F.4th 1015 (9th Cir. 2025) ..............................................................................12, 13

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009).....................................................................................................5

*Beldock v. Microsoft Corp.*,
  2023 WL 3058016 (W.D. Wash. Apr. 24, 2023)........................................................11

*Birse v. CenturyLink, Inc.*,
  2018 WL 6603961 (D. Colo. Nov. 19, 2018) .............................................................11

*Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*,
  861 F.3d 1081 (10th Cir. 2017) .................................................................................10

*Carrigan v. Xerox Corp.*,
  2022 WL 1137230 (D. Conn. Apr. 18, 2022)............................................................17

*Clinton* v. *Sec. Benefit Life Ins. Co.*,
  63 F.4th 1264 (10th Cir. 2023) ..................................................................................10

*Cunningham v. Cornell Univ.*,
  604 U.S. 693 (2025)...............................................................................................23, 24

*Daggett v. Waters Corp.*,
  731 F. Supp. 3d 121 (D. Mass. 2024) ........................................................................17

*Davis v. Washington Univ. in St. Louis*,
  960 F.3d 478 (8th Cir. 2020) .....................................................................................16

*In re DeRogatis*,
  904 F.3d 174 (2d Cir. 2018)........................................................................................23

*Ellis v. Fid. Mgmt. Tr. Co.*,
  883 F.3d 1 (1st Cir. 2018)...........................................................................................12

*England v. DENSO Int'l Am. Inc.*,
   136 F.4th 632 (6th Cir. 2025) ................................................................................................21

*Fifth Third Bancorp v. Dudenhoeffer*,
   573 U.S. 409 (2014) .............................................................................................................10

*Forman v. TriHealth, Inc.*,
   40 F.4th 443 (6th Cir. 2022) ................................................................................................19

*Gaines v. BDO USA, LLP*,
   663 F. Supp. 3d 821 (N.D. Ill. 2023) ..................................................................................17

*Gonzalez v. Northwell Health, Inc.*,
   632 F. Supp. 3d 148 (E.D.N.Y. 2022) .................................................................................17

*Harris Tr. & Sav. Bank v. Salomon Smith Barney, Inc.*,
   530 U.S. 238 (2000).............................................................................................................22

*Hecker v. Deere & Co.*,
   556 F.3d 575 (7th Cir. 2009) ...............................................................................................19

*Hughes v. Nw. Univ.*,
   595 U.S. 170 (2022).............................................................................................2, 10, 12, 18

*Hughes v. Nw. Univ.*,
   63 F.4th 615 (7th Cir. 2023) ................................................................................................17

*JDA Software Inc. v. Berumen*,
   2015 WL 8003210 (D. Ariz. Dec. 7, 2015) ........................................................................23

*Jones v. DISH Network Corp.*,
   2023 WL 2644081 (D. Colo. Mar. 27, 2023) ..........................................................2, 10, 12

*Kenseth v. Dean Health Plan, Inc.*,
   610 F.3d 452 (7th Cir. 2010) ...............................................................................................23

*Krutchen v. Ricoh USA, Inc.*,
   2022 WL 16950264 (E.D. Pa. Nov. 15, 2022) ....................................................................19

*Kurtz v. Vail Corp.*,
   511 F. Supp. 3d 1185 (D. Colo. 2021)................................................................................12

*Lalonde v. Massachusetts Mut. Ins. Co.*,
   728 F. Supp. 3d 141 (D. Mass. 2024)..................................................................................12

iii

*Matney v. Barrick Gold of N. Am.*,
    80 F.4th 1136 (10th Cir. 2023) ................................................................................... *passim*

*Mator v. Wesco Distribution, Inc.*,
    2022 WL 3566108 (W.D. Pa. Aug. 18, 2022) ...........................................................17

*Matousek v. MidAmerican Energy Co.*,
    51 F.4th 274 (8th Cir. 2022) ...........................................................................19, 20, 22

*Meiners v. Wells Fargo & Co.*,
    2017 WL 2303968 (D. Minn. May 25, 2017), *aff'd,* 898 F.3d 820 (8th Cir.
    2018) ............................................................................................................................14

*Munt v. WEC Energy Grp., Inc.*,
    728 F. Supp. 3d 957 (E.D. Wis. 2024)......................................................................17

*Pension Benefit Guar. Corp. ex rel. St. Vincent v. Morgan Stanley Inv. Mgmt.*,
    712 F.3d 705 (2d Cir. 2012)........................................................................................2

*PHH Mortg. Corp. v. Stuber*,
    766 F. Supp. 3d 1162 (D. Kan. 2025) .......................................................................25

*Probst v. Eli Lilly & Co.*,
    2023 WL 1782611 (S.D. Ind. Feb. 3, 2023) .............................................................21

*Sanctuary Surgical Ctr., Inc. v. Connecticut Gen. Life Ins. Co.*,
    2012 WL 5386555 (S.D. Fla. Nov. 1, 2012)............................................................23

*Short v. Brown Univ.*,
    320 F. Supp. 3d 363 (D.R.I. 2018)............................................................................17

*Singh v. Deloitte LLP*,
    123 F.4th 88 (2d Cir. 2024) .................................................................................20, 21

*Smith v. CommonSpirit Health*,
    37 F.4th 1160 (6th Cir. 2022) ................................................................................ *passim*

*Stark v. Keycorp*,
    2021 WL 1758269 (N.D. Ohio May 4, 2021)............................................................6

*Sulyma v. Intel Corp. Inv. Pol'y Comm.*,
    909 F.3d 1069 (9th Cir. 2018), *aff'd*, 589 U.S. 178 (2020).....................................24

*Teodosio v. DaVita, Inc.*,
    684 F. Supp. 3d 1117 (D. Colo. 2023).....................................................................17

iv

*In re Unisys Sav. Plan Litig.*,
    74 F.3d 420 (3d Cir. 1996)...........................................................................................11

*Vellali v. Yale Univ.*,
    2022 WL 13684612 (D. Conn. Oct. 21, 2022) ...........................................................18

*White v. Chevron Corp.*,
    2016 WL 4502808 (N.D. Cal. Aug. 29, 2016) ...........................................................18

**Federal Statutes**

ERISA § 413(2); 29 U.S.C. § 1113(2)..................................................................................24

ERISA § 406; 29 U.S.C. § 1106 ...................................................................................22, 24

ERISA § 502(a)(2); 29 U.S.C. § 1132(a)(2)...................................................................23, 25

ERISA § 502(a)(3); 29 U.S.C. § 1132(a)(3)..........................................................................23

**Federal Rules**

Federal Rule of Civil Procedure 12(b)(6) ......................................................................1, 10

Defendants Intermountain Healthcare, Inc. ("Intermountain"), the Board of Directors of Intermountain Healthcare Inc.[1] (the "Board"), and the Intermountain Healthcare Benefits Administration Committee (the "BAC" and collectively "Defendants"), respectfully request that this Court dismiss Plaintiffs' amended complaint ("AC") in its entirety with prejudice pursuant to Federal Rule of Civil Procedure 12(b)(6).

## I.    INTRODUCTION

Plaintiffs, participants in the Intermountain Healthcare Savings Plus 401(k) Plan ("401(k) Plan") and the Intermountain Healthcare Tax Deferred Savings 403(b) Plan ("403(b) Plan"), bring ERISA[2] claims alleging Defendants breached their ERISA fiduciary duties. The claims concern one investment option offered to plan participants as part of a menu of options and the amount charged to participants for recordkeeping services. Plaintiffs allege that the investment option did not provide high enough returns and the recordkeeping fees were excessive.

Claims like those Plaintiffs brought here are subject to a very particular legal standard under ERISA. ERISA generally sets standards of *conduct* that fiduciaries must follow when selecting investment options or recordkeeping arrangements for benefit plans. In other words, ERISA does not focus on investment returns, or the outcome of an investment selection, nor does it require fiduciaries to scour the market for the lowest possible recordkeeping fees. Fiduciaries who *act* prudently, and who select generally reasonable investments and recordkeeping arrangements, are not liable under ERISA, even if there might be supposedly better-performing investment options or lower-cost recordkeeping providers in the marketplace.

---

[1]    Intermountain is governed by a Board of Trustees, not a Board of Directors.

[2]    Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, *et seq.*

At the pleading stage, due to lack of access to information on the fiduciaries' process, courts allow plaintiffs to plead objective facts about an ERISA plan that would allow a court to infer, at the pleading stage, that the challenged plan characteristics were the result of a breach of fiduciary duty. *Pension Benefit Guar. Corp. ex rel. St. Vincent v. Morgan Stanley Inv. Mgmt.*, 712 F.3d 705, 718 (2d Cir. 2012) ("[I]f the complaint relies on circumstantial factual allegations to show a breach of fiduciary duties under ERISA, those allegations must give rise to a 'reasonable inference' that the defendant committed the alleged misconduct"). In evaluating whether the alleged facts give rise to an inference of imprudence, courts consider certain important ERISA fiduciary principles, including the fact that Congress intended to grant ERISA fiduciaries a great deal of discretion in choosing what is best for their particular plans, "the circumstances facing an ERISA fiduciary will implicate difficult tradeoffs," and that there is a "range of reasonable judgments" a fiduciary may make based on experience and expertise. *Hughes v. Nw. Univ.*, 595 U.S. 170, 177 (2022). Only where "***no reasonable fiduciary*** would have maintained the investment" could an ERISA fiduciary potentially be liable. *Jones v. DISH Network Corp.*, 2023 WL 2644081, at *6 (D. Colo. Mar. 27, 2023) (emphasis added).

These important considerations have led courts, including the Tenth Circuit, to adopt what is known as the "meaningful benchmark" standard for pleading a claim for an imprudent investment option in a retirement plan. *Matney v. Barrick Gold of N. Am.*, 80 F.4th 1136, 1148 (10th Cir. 2023). In order for a court to potentially infer imprudence at the pleading stage, a "plaintiff has the burden to allege" meaningful comparator investment options that a prudent fiduciary *would* have selected over the investment challenged by the complaint. *Id*. at 1148.

2

In the Tenth Circuit, the meaningful benchmark standard is a "pleading burden." *Id.* The plaintiff must make a "meaningful comparison" between the challenged fund and alternative investment options that is "supported by facts alleging, for example," that the options "have similar investment strategies, similar investment objectives, or similar risk profiles." *Id.* If the challenged fund and the comparators are not nearly identical in terms of key characteristics, then the court will not infer fiduciary imprudence. In fact, different overall returns are *expected* among funds with different fundamental characteristics, and there could be myriad reasons why plan fiduciaries might select certain characteristics over different characteristics.

Here, Plaintiffs fail to meet their pleading burden of identifying a meaningful benchmark, because the comparators Plaintiffs allege in the AC are not similar with respect to key characteristics that affect an investment's aims, risks, and potential rewards. On the contrary, the AC affirmatively alleges that the comparators have several different key characteristics that affect strategy, objective, and risk. Plaintiffs attempt to gloss over these fundamental differences by focusing on some *superficial* similarities between the investment they challenge—the Principal Stability Fund—and the alleged comparators, but, as shown below, those superficial similarities do not meet the meaningful benchmark standard. In fact, Plaintiffs' claims, if accepted, would require this Court to determine **as a matter if law** that no prudent fiduciary of any ERISA plan in the entire country could have selected the challenged investment simply because Plaintiffs identified products that share superficial similarities with the Principal Stability Fund but, in actuality, differ significantly in terms of key investment characteristics.

Plaintiffs' challenges to the recordkeeping fees are, frankly, confusing, at best. Plaintiffs (and all participants in the two plans) paid an amount that other plaintiffs in dozens, if not

3

hundreds, of similar lawsuits have alleged *was the goal for a reasonable recordkeeping fee* in a retirement plan—$35/participant/year. *See, e.g., Smith, et al. v. Recreational Equipment Inc., et al.*, No. 3:24-cv-06032-TMC at *1 (W.D. Wash. July 16, 2025) (alleging reasonable fee for trust, custody, and recordkeeping services should have been $38/participant/year); *see also infra* at 17 n. 10. And with recordkeeping fees, the Tenth Circuit requires the complaint to allege that "the recordkeeping services rendered by the chosen comparators are similar to the services offered by the plaintiff's plan."[3] *Matney*, 80 F.4th at 1148. Plaintiffs cherrypicked a few allegedly similar plans that paid less, but Plaintiffs allege nothing whatsoever about the nature of the services those plans received, and those plans indisputably had key differences that are among many reasons why recordkeeping fees vary from plan to plan. As a matter of law, Plaintiffs cannot state a claim for excessive recordkeeping fees when the amount paid has been cited in countless cases as *the* supposed goal for reasonable recordkeeping fees, notwithstanding Plaintiffs' cherrypicked, dissimilar plans.

Finally, Plaintiffs bring a claim for alleged fiduciary "prohibited transactions" relating to the recordkeeping services. But Plaintiffs failed to plead causation of injury, because the amount of fees was reasonable on its face. Furthermore, Plaintiffs had actual knowledge that the Plans transacted with a recordkeeper more than three years before they sued, and thus they had the requisite knowledge to start ERISA's three-year statute of limitations. This claim is time-barred and should be dismissed with prejudice.

---

[3]    Defendants are puzzled at Plaintiffs' failure to allege facts to plausibly state that the services the Plans received are similar to those in the comparators. This is a *pleading requirement* in the Tenth Circuit, and there is no good-faith basis for Plaintiffs to have ignored this requirement. *Matney*, 80 F.4th at 1148.

4

## II.   PLAINTIFFS' ALLEGATIONS[4]

### A.   The Intermountain 401(k) and 403(b) Plans

Intermountain sponsors the 401(k) Plan and the 403(b) Plan (each a "Plan" and together the "Plans") to help its employees save for retirement.[5] The Plans are separate, with different investments and regulatory requirements.[6] The Plans also have different amounts of assets and numbers of participants. According to Plaintiffs, as of 2023, the 401(k) Plan had $6,014,924,000 and 80,894 participants, and the 403(b) Plan had only $309,616,000 and only 4,492 participants—$6 billion less in assets and 75,000 fewer participants. AC ¶¶ 13, 16. The AC ignores these distinctions and lumps the 401(k) Plan and 403(b) Plans together as the "Plans," alleging facts about them collectively instead of separately.

Plaintiffs claim Intermountain, acting through the Board, appointed the BAC to serve as the Plans' administrator. *Id*. at ¶¶ 42-43. Plaintiffs claim the BAC, in turn, administered the Plans and was responsible for selecting the Plans' investments. *Id*. at ¶ 48.

### B.   The Plans' Investments and the Principal Stability Fund

Each Plan offers a variety of investments for participants to choose to invest their account balances. Of these investments, Plaintiffs complain about **only one**—this is telling, because

---

[4]   Unless otherwise stated, Defendants summarize allegations in the AC, presumed true only for this motion. *See, e.g.*, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

[5]   All six Plaintiffs allege they were participants in the 401(k) Plan. AC at ¶¶ 30-35. Of the six Plaintiffs, only Philip Winters alleges he was a participant in the 403(b) Plan. *Id*. at ¶ 33.

[6]   For example, ERISA restricts the types of investments that 403(b) plans can offer, while it does not place similar restrictions on 401(k) plans. *See 403(b) vs. 401(k) Plans: What's the Difference?,* Investopedia (updated January 11, 2025) available at https://www.investopedia.com/ask/answers/100314/what-difference-between-401k-plan-and-403b-plan.asp

Plaintiffs do not allege an overarching breach of fiduciary process that infected all options. Plaintiffs focus on one option, tacitly acknowledging that the others were prudently selected.

The investment option that Plaintiffs challenge is surprising because it is, by its nature, not designed to provide the highest returns. The Principal Stability Fund is a "capital preservation" option. The AC acknowledges that the capital preservation option has the goal of "preservation of investment assets." *Id*. at ¶ 22. Put another way, the Stability Fund is "intended to provide participants with an option that protects their assets and is shielded from risks of loss." *Id*. at ¶ 84. Its goal is asset protection.

The Stability Fund is a "stable value" fund in the form of a "guaranteed investment contract," or GIC. GICs typically are offered by insurers as a fixed annuity contract with a guaranteed rate of return, or "crediting rate," during a specified period. *Id*. at ¶ 85. That rate is essentially the interest rate that participants earn while their capital is being preserved.

According to Plaintiffs, there are three different types of stable value funds that differ in key characteristics.  *Id*. at ¶¶ 87-91. The first option, allegedly offered in "large" plans, are **synthetic** stable value funds. *Id*. at ¶ 87. Synthetic funds consist of several underlying GICs "wrapped together" into a single fund, with the underlying GICs guaranteed by multiple different insurance companies or providers. *Id*. The fund owns the underlying asset, *id*., but because synthetic funds are backed by multiple insurance companies (called "wrap providers"), they are the **least risky** of the various stable value options. *Id*.; *see also Stark v. Keycorp*, 2021 WL 1758269, at *3 (N.D. Ohio May 4, 2021) ("wrap" contracts guarantee the portfolio against loss of principal and avoid risk of loss).

6

The second option, **separate account** GICs, are guaranteed by a single insurance company and are therefore riskier than synthetic funds. AC at ¶ 88. The investment assets are held in a separate account of the insurance carrier. *Id*. Due to their **higher level of risk**, separate account stable value funds offer higher crediting rates than synthetic funds. *Id*.

The third option is called the **general account** product, which also is guaranteed by a single insurance company, but the investment assets are held in the general account of the insurance provider, not in a separate account. *Id*. at ¶ 90. Because the assets are held in unrestricted general accounts, they are subject to claims and liabilities asserted against the insurer and subject to a **more significant, single entity credit risk**. *Id*. at ¶ 91. General account products are the riskiest and consequently "offer the highest rates." *Id*. at ¶ 90.

Plaintiffs allege the Stability Fund is a guaranteed, synthetic stable value fund invested in underlying multiple "synthetic GICs" guaranteed by several "wrap" providers, including Voya, Pacific Life, Prudential, Transamerica, RGA, and Lincoln National. *Id*. at ¶¶ 21, 60. According to Plaintiffs, the Auditor's Report attached to the 2023 Form 5500 for the 401(k)Plan[7] describes the Stability Fund as "a proprietary fund of the Plan that consists of fully benefit-responsive synthetic guaranteed investment contracts (Synthetic GICs)." *Id*. at ¶ 60 (citing the Auditor's Report attached to 2023 401(k) Form 5500, at 10).

Plaintiffs allege it was imprudent to retain the Stability Fund as the stable value option because it offered a lower crediting rate than other allegedly "substantially identical" products on the market. *Id*. at ¶¶ 104-106. The AC identifies, in a series of charts, supposedly superior stable-

---

[7]     Form 5500s are public disclosures that benefit plans file with the Department of Labor, accessible at https://www.efast.dol.gov/welcome.html.

value products that Plaintiffs conclude, without alleging sufficient facts, are supposedly "identical" comparators. *Id*. at ¶ 105-106. But even a quick read of the charts reveals the comparators have fundamental differences in terms of strategy, goals, and approaches. The Stability Fund is the lone fund that is guaranteed by multiple wrap providers. *Id*. ¶ 106. All the comparator funds are guaranteed by a *single* issuer, which is a fundamentally different risk that is expected to provide greater returns. *Id*. Contributions made to the comparators are invested in the issuer's "general assets" or "general accounts." *Id*. at ¶ 105.

### C.    The Plans' Recordkeeping Fees

Like all retirement plans, the Plans require services to operate. Plaintiffs focus on the "recordkeeping and administrative fees" both Plans incurred in their day-to-day operation and management. *Id*. ¶¶ 127-129. The broad descriptors "recordkeeping fees" and/or "administrative fees" can encompass a wide variety of services and can vary significantly from plan to plan and provider to provider, based on the services provided, the features of the plan, participants' needs, the plan's size, and the provider's level and quality of service. *See, e.g.*, *Smith v. CommonSpirit Health*, 37 F.4th 1160, 1169 (6th Cir. 2022) (fiduciaries may offer different "services and tools" based on plan size). In the Tenth Circuit, plaintiffs cannot state a claim for excessive recordkeeping fees with boilerplate allegations that "recordkeeping services" or "administrative services" are fungible among service providers. There must be facts to state that "the recordkeeping services rendered by the chosen comparators are similar to the services offered by the plaintiff's plan." *Matney*, 80 F.4th at 1148.

Plaintiffs allege both the 401(k) and 403(b) Plans paid "recordkeeping and administrative" fees—which they shortened to "RKA fees"—to third-party T. Rowe Price

("TRP") for a specific package of services consisting of maintaining participant account balances, providing a website and telephone number for plan participants to monitor and control their accounts, and other services. AC ¶ 118. Plaintiffs claim both the 401(k) Plan and the 403(b) Plan paid about $35 per participant, per year in RKA fees. *Id.* ¶ 128. Plaintiffs allege that both the 401(k) Plan and the 403(b) Plan should have been able to obtain RKA fees of no more than $22 per participant. *Id.* ¶ 133. Their basis for these comparative prices come from the RKA fees that ten 401(k) plans allegedly paid to third party recordkeepers in various years of the class period. *Id.* ¶ 129. Of the ten, only two of the comparator plans used TRP, but Plaintiffs allege nothing about the actual services they received. *Id.* According to Plaintiffs, the comparator plans were "similar in size" to the ***combined*** 401(k) and 403(b) Plans and should have received RKA services "identical" to the RKA services both Plans received. *Id.* Plaintiffs claim that when "fiduciaries are tasked with caring for multiple plans with the same sponsor, they will bargain with providers using the aggregate of the plans' sizes," *id.* ¶ 18, but they allege no facts that the 401(k) and 403(b) Plans were in fact aggregated during fee negotiations with TRP.

D.    **Plaintiffs' Claims**

In Count I, Plaintiffs allege that the BAC breached its duty of prudence by retaining the Stability Fund and allowing TRP to charge allegedly "excessive" RKA fees to both Plans. *Id.* ¶¶ 137-143. In Count II, Plaintiffs allege that Intermountain and the Board, as the entities that appointed the BAC, had a duty to monitor the BAC's choices regarding the Plan's investments and fees and failed to fulfill that duty. *Id.* ¶¶ 144-150. In Count III, Plaintiffs claim all Defendants caused the Plans to engage in an ERISA prohibited transaction by contracting with TRP for RKA services. *Id.* ¶¶ 151-156. All of Plaintiffs' claims fail.

### III.   ARGUMENT

### A.   Plaintiffs Fail to State a Plausible Claim for Breach of the Duty of Prudence

1.   12(b)(6) Legal Standards

"The familiar Rule 12(b)(6) pleading standard applies to breach of fiduciary duty claims under ERISA." *Matney*, 80 F.4th at 1144 (citations omitted). "[A] plaintiff must plead sufficient factual allegations 'to state a claim to relief that is plausible on its face.' " *Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 861 F.3d 1081, 1104 (10th Cir. 2017) (quotations omitted). To satisfy the plausibility standard, "the complaint must plead 'factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.' " *Clinton* v. *Sec. Benefit Life Ins. Co.*, 63 F.4th 1264, 1275 (10th Cir. 2023) (citations omitted).

Under ERISA, 12(b)(6) motions are an "important mechanism for weeding out meritless claims." *Fifth Third Bancorp v. Dudenhoeffer,* 573 U.S. 409, 425 (2014). Courts must read complaints with an understanding that "the circumstances facing an ERISA fiduciary will implicate difficult tradeoffs," and "give due regard to the range of reasonable judgments a fiduciary may make." *Hughes*, 595 U.S. at 177. Because ERISA's duty of prudence imposes standards of conduct, courts "focus on the process by which [the fiduciary] makes its decisions rather than the results of those decisions." *DISH Network Corp.*, 2023 WL 2644081, at *6 (quotations omitted). "A plaintiff " 'must allege facts to support the conclusion that the Defendants would have acted differently had they engaged in proper monitoring—and that an alternative course of action could have prevented the Plan's losses.' " *Id*. (quotations omitted). A plaintiff must allege facts "plausibly establishing that *no reasonable fiduciary* would have maintained the investment." *Id*. (emphasis added).

10

    2.    <u>The Retention of the Principal Stability Fund Does Not Raise an Inference of Imprudence</u>

In Count I, Plaintiffs allege that this Court can infer that the BAC's process for monitoring the Plans' investments was flawed because the Stability Fund underperformed allegedly similar investments. Plaintiffs' claim fails.

    a.    *Key Principles Regarding Imprudent Investment Claims*

Some key ERISA principles are important here. ***First***, allegations that an investment option performed poorly, or did not provide high enough returns, are insufficient as a matter of law to state an ERISA claim. This is because the duty of prudence requires courts to focus on a "fiduciary's conduct in arriving at an investment decision, not on its results." *Birse v. CenturyLink, Inc.*, 2018 WL 6603961, at *5 (D. Colo. Nov. 19, 2018) (citing *In re Unisys Sav. Plan Litig.*, 74 F.3d 420, 434 (3d Cir. 1996)). Hindsight-based assertions of underperformance "improperly focus[] on the outcome rather than the process" and say nothing about whether a plan fiduciary *acted* imprudently at the time of the decision. *Birse*, 2018 WL 6603961, at *9 (recommending dismissal of imprudent investment claims); *see also Beldock v. Microsoft Corp.*, 2023 WL 3058016, at *3 (W.D. Wash. Apr. 24, 2023) ("[C]ourts across the country have rejected claims for breach of the fiduciary duty of prudence under ERISA where the plaintiffs allege nothing more than underperformance"). This is even more true when plaintiffs—as they do here—merely point to underperformance during "a five-year snapshot of the lifespan of a fund that is supposed to grow for fifty years," because "[p]recipitously selling a well-constructed portfolio in response to disappointing short-term losses" is "one of the surest ways to frustrate the long-term growth of a retirement plan." *Smith v. CommonSpirit Health*, 37 F.4th 1160, 1167

(6th Cir. 2022) (affirming dismissal of imprudent investment claim premised on underperformance).

*Second*, allegations that a better-performing option was available in the marketplace does not state an ERISA claim as a matter of law. *Kurtz v. Vail Corp.*, 511 F. Supp. 3d 1185, 1196 (D. Colo. 2021) ("[R]elative underperformance is insufficient to state a claim"). This is particularly true for capital-preservation options, like the Stability Fund. As the First Circuit explained, "[s]uch funds are generally presented as one of the more conservative options for investors who prefer asset preservation to the risk of pursuing greater returns. A conservative benchmark for a fund that places principal preservation as its primary goal warns the investor not to expect robust returns, and aligns expectations and results in a manner that is unlikely to harm or disappoint any investor who selects the fund." *Ellis v. Fid. Mgmt. Tr. Co.*, 883 F.3d 1, 9 (1st Cir. 2018).

*Third*, ERISA fiduciaries "are not required to adopt a riskier strategy simply because that strategy may increase returns." *Anderson v. Intel Corp. Inv. Pol'y Comm.*, 137 F.4th 1015, 1024 (9th Cir. 2025). The fact that "the marketplace was replete with other, unaffiliated stable value fund products that offered better terms" cannot support an inference of breach, because "plans are under no obligation to offer a particular mix of investment funds." *Lalonde v. Massachusetts Mut. Ins. Co.*, 728 F. Supp. 3d 141, 156 (D. Mass. 2024). Congress intended to grant ERISA fiduciaries a great deal of discretion in choosing what is best for their particular plans, and "there is a "range of reasonable judgments" a fiduciary may make based on experience and expertise. *Hughes*, 595 U.S. at 177. Only where "***no reasonable fiduciary*** would have maintained the investment" could an ERISA fiduciary potentially be liable. *DISH Network Corp.*, 2023 WL 2644081, at *6 (emphasis added).

12

*Fourth*, in order to give rise to an inference that the selection and retention of an investment was the result of an imprudent fiduciary process, a plaintiff must compare the challenged investment to "meaningful benchmarks." *Matney*, 80 F.4th at 1148. Vitally, the meaningful benchmark standard requires nearly "identical" investment characteristics because ERISA does not mandate that fiduciaries choose any particular investment strategy. *Id.* at 1151 (identical funds offer "apples-to-apples comparisons"). ERISA grants fiduciaries broad discretion to determine what type of investments, levels of risk, levels of return, and investment approaches they want to offer to plan participants. *Anderson*, 137 F.4th at 1024. If a plaintiff wants to challenge a particular investment, the plaintiff cannot do so by comparing the investment to alternatives with different characteristics, because fiduciaries are not required to select alternatives with different characteristics. *Matney*, 80 F.4th at 1150 (even funds in similar categories, with generally similar approaches, or the same general investment style, cannot be assumed to be meaningful comparators). A plaintiff must identify nearly identical alternatives such that a court can infer that no prudent fiduciary would have selected the challenged investment in view of nearly identical investments that were readily available.

b.    *The Stability Fund and the Comparators Have Fundamentally Different Risks, Rewards, and Investment Goals*

Here, the AC fails to meet the meaningful benchmark requirement because, as the AC admits, the Stability Fund and the supposed comparators indisputably had fundamentally different characteristics with respect to risk and returns. As the AC admits, the Stability Fund is a type of annuity that is guaranteed by multiple underlying GICs, making it a "synthetic stable value fund." AC ¶ 99. The Stability Fund inherently has the *least risk* of the three different types of stable value funds, because one of the key characteristics of a synthetic fund is that it is

13

guaranteed by multiple GICs. As such, its rate of return *is expected to be lower* than stable value investments that are not guaranteed by multiple GICs and that keep assets in riskier types of accounts. *Id*. ¶ 87. To this end, Plaintiffs then compare the Stability Fund to GICs issued by a single insurance company that are held in the "general assets" or the "general account" of the insurance company. *Id*. ¶¶ 105-106. As Plaintiffs again acknowledge, these investments are inherently much riskier, because they are subject to creditors of a single entity; accordingly, the returns are expected to be higher. *Id*. ¶ 90-91. Where, as here, fundamental differences in investment style and risk explain why a challenged investment provided a lower return than comparators, then the meaningful benchmark pleading requirement has not been met. *Matney*, 80 F.4th at 1154 ("'side-by-side comparison of how two funds performed . . .with no consideration of their distinct objectives'" is "unhelpful for determining which is the more prudent choice") (quoting *CommonSpirit Health*, 37 F.4th at 1167); *see also Meiners v. Wells Fargo & Co.*, 2017 WL 2303968, at *3 (D. Minn. May 25, 2017), *aff'd,* 898 F.3d 820 (8th Cir. 2018) (dismissing allegations when comparator funds had "different strategy" than plan funds because "one would expect" them to "perform differently").

c.     <em>New Allegations Added to the AC are Red Herrings</em>

Plaintiffs filed the AC after Defendants filed a motion to dismiss the initial complaint, in which Defendants argued that the comparators were not meaningful benchmarks. In the AC, Plaintiffs added allegations about certain superficial similarities between the Stability Fund and the comparators in an attempt to argue that the comparators are, in fact, meaningful benchmarks.

But the supposed similarities alleged in the AC do not address key risk and reward characteristics that courts are required to consider under the meaningful benchmark standard.

14

First, Plaintiffs allege that the Stability Fund and other GICs all are "fully benefit-responsive," meaning that they all "transact at book or contract value for benefit payments."[8] Book or contract value, in turn, is the "value of initial deposited principal, plus accumulated interest, plus additional deposits, minus withdrawals and expenses."[9] This characteristic is nothing more than a general description of what a stable value investment is—this characteristic has nothing to do with key risk, reward, and investment strategy characteristics. All GICs attempt to shield participants from "risks of loss" by guaranteeing the "principle of the contract" and "guaranteeing a rate of return or 'crediting rate' during a specified period." *Id*. ¶¶ 84-85. As the Tenth Circuit explained in *Matney*, general, broad similarities are not enough; a plaintiff has the burden of pleading specifics about "aims," "risks," and "potential rewards," and Plaintiffs have not done so here. *Matney*, 80 F.4th at 1150 (general, broad similarities not enough to be meaningful benchmarks).

Next, Plaintiffs allege that the Stability Fund and alleged comparators are similar because they "do not permit the insurance companies to terminate the agreements before the end of the contract." *Id*. ¶ 102. This allegation warrants little discussion. This has absolutely nothing whatsoever to do with risk, reward, or investment goals.

Plaintiffs then allege that the Stability Fund and alleged comparators all have their "rates [] reviewed regularly." *Id*. ¶ 102. This, too, has nothing to do with the fundamental investment strategy, risk, and potential reward. This is simply a generic description of the investments

---

[8]    Stable Value Investment Association, *Definition of "Benefit Responsive*," available at https://www.stablevalue.org/benefit-responsive/

[9]    Stable Value Investment Association, Definition of "Book Value," available at https://www.stablevalue.org/book-value-also-known-as-contract-value/

themselves and a feature of all stable value investments that does not address fundamental investment characteristics required for a meaningful-benchmark analysis.

Finally, Plaintiffs allege that the "contracts are with creditworthy insurance carriers." *Id.* ¶ 102. Again, this has nothing to do with risk, reward, and investment goals. As Plaintiffs admit, when comparing stable value investments, the key characteristics with respect to risk, reward, and investment goal are the number of insurers that guarantee the investment and how the assets are held. *See id.* ¶¶ 87-91. As noted above, the Stability Fund is guaranteed by *multiple* insurance providers, while the comparators are each guaranteed by a single company. Thus, if one of the Stability Fund's insurers becomes insolvent, then the others still secure the contract's guarantee. This is not the case for the single-issue products. Then, some comparators maintain assets in a separate account, while others keep the money in the insurer's general account. The Stability Fund is less risky, regardless of the insurers' creditworthiness, and this is precisely why the Stability Fund was expected to have lower rates of return.

Plaintiffs cannot state a claim for fiduciary imprudence by alleging that the Stability Fund had a lower crediting rate than other stable value funds that were expected to have higher rates because they had different fundamental characteristics. *See, e.g., Davis v. Washington Univ. in St. Louis*, 960 F.3d 478, 485 (8th Cir. 2020) (affirming dismissal of imprudence allegations premised on dissimilar fund comparisons because "[c]omparing apples and oranges is not a way to show that one [fund] is better or worse than the other"). The claims should be dismissed with prejudice.

16

3.    Recordkeeping Fees Paid to TRP Do Not Raise an Inference of Imprudence

In Count I, Plaintiffs ask this Court to infer that the BAC's process for managing the Plans' recordkeeping expenses was flawed because the amount of the expenses alone allegedly was so high that no prudent fiduciary would have approved them for the Plans. This claim borders on absurdity.

For more than a decade, plaintiffs have been filing class-action ERISA claims against retirement-plan fiduciaries on the grounds that the plans charged excessive recordkeeping fees. For many years, complaints in these cases alleged that a "reasonable" recordkeeping fee would be $35/participant/year for jumbo sized plans.[10] The allegation that $35/participant/year was the reasonable standard was unsupported in the first instance, and courts have found fees higher than

---

[10]    *See, e.g., Gonzalez v. Northwell Health, Inc.*, 632 F. Supp. 3d 148, 166 (E.D.N.Y. 2022) ("the market rate of total administrative fees for jumbo plans, i.e., those within the top 1%, should be $35 per participant"); *Hughes v. Nw. Univ.*, 63 F.4th 615, 625 (7th Cir. 2023) ("Northwestern was not required to search for a recordkeeper willing to take $35 per year per participant as plaintiffs would have liked"); *Smith v. CommonSpirit Health*, 37 F.4th 1160, 1169 (6th Cir. 2022) ("Smith alleges that this fee was too high, citing industry average costs of $35 per person for recordkeeping and administration for smaller plans"); *Short v. Brown Univ.*, 320 F. Supp. 3d 363, 371 (D.R.I. 2018) (alleging "reasonable recordkeeping fee for the Plans would have been a fixed amount between ... approximately $35-$45 per participant"); *Gaines v. BDO USA, LLP*, 663 F. Supp. 3d 821, 831 (N.D. Ill. 2023) (alleging "a reasonable fee would not exceed $35 per participant"); *Carrigan v. Xerox Corp.*, No. 3:21-CV-1085 (SVN), 2022 WL 1137230, at *2 (D. Conn. Apr. 18, 2022) (alleging "various comparable plans paid recordkeeping fees of $35 per participant or less each year"); *see also* Amended Complaint, *Sweda v. Univ. of Pa.*, No. 16-4329, Dkt. No. 27, pp. 50-51 (E.D. Pa. Nov. 21, 2016) (alleging the plan should have paid no more than $35 per participant); *Mator v. Wesco Distribution, Inc.*, No. 2:21-CV-00403-MJH, 2022 WL 3566108, at *2 (W.D. Pa. Aug. 18, 2022) (reasonable fee would have been $42 per participant); *Munt v. WEC Energy Grp., Inc.*, 728 F. Supp. 3d 957, 964 (E.D. Wis. 2024) (reasonable fee would have been on average $35 per participant); *Teodosio v. DaVita, Inc.*, 684 F. Supp. 3d 1117, 1125 (D. Colo. 2023) (reasonable fee would have been no more than $36 per participant); *Daggett v. Waters Corp.*, 731 F. Supp. 3d 121, 130 (D. Mass. 2024) (reasonable fee would have been $45 per participant)

17

$35/participant/year to be reasonable. *See, e.g.*, *Vellali v. Yale Univ.*, 2022 WL 13684612, at *14 (D. Conn. Oct. 21, 2022) (plaintiffs' expert opined that $83-$40 per participant would have been a reasonable recordkeeping fee); *Garcia v. Alticor*, No. 20-cv-1078, ECF No. 113, Opinion and Order (W.D. Mich. Apr. 16, 2024) (granting summary judgment in defendants' favor when fees ranged between $53-$62 per participant from 2016 to 2022 before switching to a flat fee of $18 per participant in 2023). But this history demonstrates that no matter what amount a plan pays, some plaintiff can scour Form 5500 filings to try and find some other plan that paid less, so they can make the baseless allegation that their plan fiduciaries breached ERISA duties by not causing their plan to pay less.

That is precisely what Plaintiffs have done here. They claim that from 2019 to 2023, each Plan paid "RKA" fees to TRP that averaged $35 per participant per year. AC ¶ 128. Plaintiffs allege that each Plan should have paid less than $35, because they cherrypicked ten 401(k) plans of allegedly "similar size," and based on Form 5500 data, those plans paid on average about $22 per participant during various points of the putative class period. *Id*. ¶¶ 129, 133. On this basis alone, without alleging any specifics about the services that were provided, the nature of the services, or the quality of the services, Plaintiffs say this Court should infer that the BAC's fiduciary process was imprudent.

Plaintiffs' allegations fail to state a claim. The sole focus of Plaintiffs' fee-based claims—cost alone—is not a cognizable challenge in view of the flexibility ERISA grants to plan fiduciaries. *See Hughes*, 595 U.S. at 177. Courts have repeatedly emphasized that a fiduciary has no duty to select the lowest-cost option, "which might, of course, be plagued by other problems." *White v. Chevron Corp.*, 2016 WL 4502808, at *10 (N.D. Cal. Aug. 29, 2016) (quoting *Hecker v.*

18

*Deere & Co.*, 556 F.3d 575 (7th Cir. 2009)). Plaintiffs' entire theory is that if one plan pays more in fees than others, it is plausible to infer that the plan fiduciaries who approved higher fees acted imprudently. But ERISA does not focus solely on cost; ERISA requires fiduciaries to ensure fees are *reasonable* (which itself is a wide range of figures) for the *specific services* a plan receives in exchange. *See, e.g., Albert v. Oshkosh Corp.*, 47 F.4th 570, 579 (7th Cir. 2022) (courts have "repeatedly emphasized" the cheapest option is "not necessarily the one a prudent fiduciary would select," rather, fees must be reasonable in light of "the quality or type of recordkeeping services" received).

Plaintiff must allege the fees were "excessive relative to the services rendered." *Matney*, 80 F.4th at 1148 (citing *CommonSpirit*, 37 F.4th at 1169)). The complaint must contain factual allegations that "identify similar plans offering the *same services* for less." *Id*. at 1157 (citing *Matousek v. MidAmerican Energy Co.*, 51 F.4th 274, 279 (8th Cir. 2022)); *see also, e.g., Forman v. TriHealth, Inc.*, 40 F.4th 443, 449 (6th Cir. 2022) (affirming dismissal where "the employees never alleged that these fees were high in relation to the services that the plan provided"); *Krutchen v. Ricoh USA, Inc.*, 2022 WL 16950264, at *3 (E.D. Pa. Nov. 15, 2022) (allegations regarding the quality and type of services are necessary to survive dismissal because retirement plans "may select diverse services" and "prioritiz[e] various options differently"). In other words, Plaintiff must allege "what those services are." *Matousek*, 51 F.4th at 279.

The AC has zero facts about the *specific* "RKA" services the ten comparator plans received or *specific* "RKA" services TRP provided to each Plan. Plaintiffs do not even allege that the ten comparator plans received services provided by TRP—of the ten, only two used TRP while the others used other third party recordkeepers. AC ¶ 129. As for the 403(b) Plan, the ten

19

comparators are significantly larger in both assets under management and number of participants—in 2023, the 403(b) Plan had $309,616,000 in assets and 4,492 participants while the comparators had between $5.7 and $10 *billion* in assets and between 26,000 and 71,000 participants. According to Plaintiffs' own allegations, the 403(b) Plan would have substantially less "bargaining power" to negotiate for lower fees than the ten comparators, which are at least *eighteen* times its size. *Id*. at ¶¶ 14-17 (the larger the plan, the more fee-bargaining power it has). Such "apples to oranges" comparisons do not support a claim of imprudence. *See Matousek*, 51 F.4th at 279 (dismissing claim that failed to allege a "like-for-like comparison").

Plaintiffs apparently recognize problems with their flawed comparisons and make a passing attempt to address them by characterizing recordkeeping services as fungible, claiming that "the services chosen by all large plans do not affect the amount charged by recordkeepers." *Id*. ¶ 119. This is ridiculous and violates the pleading requirement set forth in *Matney*; Plaintiffs have the burden of pleading specifics about the services in order to potentially state a claim for excessive recordkeeping fees. *See supra* at 19. [11]

Courts, including several recent appellate decisions, have rejected Plaintiffs' reliance on allegations that all large plans receive nearly identical recordkeeping services. *See Singh v. Deloitte LLP*, 123 F.4th 88, 95 (2d Cir. 2024) (plaintiffs failed to allege sufficient allegations about "recordkeeping services provided by the [plan at issue] or by the six [comparators]" when

---

[11]    Plaintiffs claim they did not have access to documents that would have described the Plans' services. AC ¶¶ 78-80. But the meaningful benchmark requirement is a pleading requirement regardless of whether participants have access to inside information about the Plans or not. Moreover, ERISA requires plan administrators to provide certain documents to Plaintiffs upon request, and Plaintiffs do not claim that the documents they requested were required to be provided.

they "conclusorily allege that 'nearly all recordkeepers in the marketplace offer the same range of services'"); *England v. DENSO Int'l Am. Inc.*, 136 F.4th 632, 637 (6th Cir. 2025) ("generic allegations about similar services across the industry" and about plans' ability to "negotiate favorable rates based on economies of scale" say "nothing about the disparity in services to sufficiently move the needle from implausible to plausible"); *see also Probst v. Eli Lilly & Co.*, 2023 WL 1782611, at *10 (S.D. Ind. Feb. 3, 2023) (allegations that all plans of a certain size "receive nearly identical recordkeeping services" are "wholly conclusory" and "do nothing to identify what specific types of services comparator plans received relative to the [plan at issue]").

Moreover, Plaintiffs' own allegations belie the contention that services are fungible. Even among the ten comparator plans, there is a $20 range of recordkeeping fees Plaintiffs claim were reasonable—from $9 per participant to $29 per participant. AC ¶ 129. This $20 range is wider than the difference between the highest allegedly reasonable fee ($29) and what the Plans paid ($35, for a difference of only $6). This information alone puts the lie to Plaintiffs' oft-rejected "implication that the allegation of a cost disparity alone, without some consideration of the surrounding context, categorically suggests imprudence." *Singh*, 123 F.4th 95.

Plaintiffs' conclusory assertions about RKA fees are further undermined by other allegations in the AC. According to Plaintiffs' false and unsupported opinion, the *only* metric that matters for purposes of setting RKA fees is the size of the plan, with larger plans having more bargaining power to negotiate for lower fees.[12] Yet in several instances, Plaintiffs cite a

---

[12]    Plaintiffs also impermissibly lump the 403(b) Plan and the 401(k) Plan together when discussing their bargaining power but allege no facts to suggest these two Plans negotiated fees

comparator plan that paid *less* than a larger comparator plan. For example, in 2023, one of the plans, the Sutter Health 403(b) Savings Plan, allegedly had approximately 71,000 participants and allegedly paid $24 per participant. The Thermo Fisher Scientific Inc. 401(k) Retirement Plan allegedly had approximately 55,000 participants and allegedly paid $18 per participant. The Sutter Health Plan had about 15,000 more participants than the Thermo Fisher Plan, and according to Plaintiffs, would have been able to negotiate lower fees, but paid $6 more per participant than the Thermo Fisher Plan. Another plan, the Dow Chemical Company Employees' Savings Plan, had almost half the number of participants of both the Thermo Fisher and Sutter Health Plans, approximately 33,000, but paid only $9 per participant, *50% less than* Thermo Fisher and *75% less than* Sutter Health.

Plaintiffs fail to allege facts about the nature, type, and level of RKA services provided to *each* Plan and how those services are similar in nature to those provided to the comparators. These allegations are absolutely necessary for a court to draw inferences that other plans "spend less on the same services," and that the BAC's process for assessing those fees may have been flawed. *See Matousek*, 51 F.4th at 279. Plaintiffs' failure to do so warrants dismissal.

### B.      Plaintiffs Fail to State a Claim Premised on a Prohibited Transaction

Plaintiffs allege in Count III that Defendants violated ERISA's fiduciary prohibited-transaction provisions found in ERISA Section 406,[13] because Defendants "caused" the Plans to

---

with TRP on a joint basis or even could do so, given their differences in size, investments (as required by ERISA), and regulatory requirements.

[13]      ERISA § 406 broadly prohibits a fiduciary from causing a plan to engage in transactions with a party in interest. These prohibitions are subject to exemptions for the most common transactions involving plans. *Harris Tr. & Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 250-53 (2000) ("Section 406's prohibitions are subject to both statutory and regulatory exemptions.") The Supreme Court has held that a participant can state a violation of ERISA's

contract with TRP, a party-in-interest, for recordkeeping services. *See* AC ¶ 114 ("Defendants entered into a contract with TRP to provide RKA services to the Plans. However, such an engagement is a prohibited transaction under ERISA."); *see also id*. ¶¶ 115-16; 151-56. This claim fails for two reasons.

*First,* Plaintiffs have failed to allege that the prohibited transaction caused loss to the Plans. The claims Plaintiffs brought, pursuant to ERISA §§ 502(a)(2) and (a)(3), require Plaintiffs to plead and ultimately prove not just a fiduciary breach, but also that the breach caused damages and that the relief they seek is available. *See, e.g.*, *Kenseth v. Dean Health Plan, Inc.*, 610 F.3d 452, 464 (7th Cir. 2010); *JDA Software Inc. v. Berumen*, 2015 WL 8003210, at \*1 (D. Ariz. Dec. 7, 2015) (citations omitted); *Sanctuary Surgical Ctr., Inc. v. Connecticut Gen. Life Ins. Co.*, 2012 WL 5386555, at \*5 (S.D. Fla. Nov. 1, 2012); *In re DeRogatis*, 904 F.3d 174, 190 (2d Cir. 2018) (discussing elements of (a)(3) claim against a fiduciary).

Here, Plaintiffs claim they were harmed not simply because of the retention of the recordkeeper, but specifically because the recordkeeping charges were excessive. Plaintiffs' chosen theory of damages is participants paid too much for recordkeeping services. They have not, however, pleaded facts to support that the fees for the services were, in fact, excessive. *See supra* at 19-22. On the contrary, the amount of fees was, on its face, reasonable and therefore did not cause the Plans losses. *Id*. Thus, even if Plaintiffs have adequately alleged that the Plans' arrangements with TRP were technically prohibited transactions, they have failed to allege the recordkeeping arrangements caused the Plans any losses. *See Cornell Univ.*, 604 U.S. at 708

---

prohibited-transactions merely by alleging the transaction without having to plead around the exemptions. *Cunningham v. Cornell Univ.*, 604 U.S. 693, 708 (2025).

23

(district courts must "dismiss suits that allege a prohibited transaction occurred but fail to identify an injury").

***Second***, ERISA's three-year limitations period expired before Plaintiffs brought their claim for an underlying prohibited transaction, because Plaintiffs had actual knowledge that TRP was the Plans' recordkeeper by 2019, at the very latest. ERISA's three-year statute of limitations bars claims "three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation." 29 U.S.C. § 1113(2). In the Tenth Circuit, "only knowledge of the essential facts constituting the alleged violation or breach is required to trigger § 1113(2)'s three-year limitations period." *AGI Consulting L.L.C., by Al-Assaf v. Am. Nat'l Ins. Co.*, 378 F. Supp. 3d 1056, 1065 (W.D. Okla. 2019), *aff'd sub nom. AGI Consulting L.L.C. v. Am. Nat'l Ins. Co.*, 798 F. App'x 296 (10th Cir. 2020). It is "not necessary that ... [P]laintiff also have actual knowledge that th[ose] facts establish[ed] a cognizable legal claim under ERISA ... to trigger the running of the statute." *Id*.

Where, as here, the alleged fiduciary breach is causing a plan to engage in a transaction prohibited under ERISA Section 406, "plaintiff need only be aware that the defendant has engaged in a prohibited transaction, because knowledge of the transaction is all that is necessary to know that a prohibited transaction has occurred." *Sulyma v. Intel Corp. Inv. Pol'y Comm.*, 909 F.3d 1069, 1075 (9th Cir. 2018), *aff'd*, 589 U.S. 178 (2020). This is particularly true in view of the Supreme Court's decision in *Cornell*, where the Court held that a plaintiff can state a claim for a prohibited transaction merely by alleging the transaction occurred. *Cornell Univ.,* 604 U.S. at 709 (to state a claim premised on a Section 406 violation, plaintiffs must "plausibly allege that a plan fiduciary engaged in a transaction proscribed therein, no more, no less").

24

"To resolve a statute of limitations issue on a motion to dismiss, the Court must find that the face of the complaint makes the answer 'apparent.' " *PHH Mortg. Corp. v. Stuber*, 766 F. Supp. 3d 1162, 1169 (D. Kan. 2025) (quotations omitted). Here, it is "apparent" from the face of the complaint that Plaintiffs had actual knowledge as early as 2019 that TRP was the Plan's recordkeeper and accordingly had "knowledge of the transaction" on which they base their claim in Count III. Plaintiffs allege that TRP was the recordkeeper throughout the class period. AC ¶ 114. They also allege the class period begins on June 3, 2019. *Id.* ¶ 51. Thus, according to their allegations, Plaintiffs knew at least as early as June 3, 2019 that TRP was the Plans' recordkeeper. Their Count III claim premised on the recordkeeping arrangement with TRP started running on that date and expired, at the latest, on June 3, 2022, three years after they gained knowledge of the transaction. But Plaintiffs did not bring their claims until they filed this lawsuit on June 3, 2025, three years too late. Count III should be dismissed.

## C.    Plaintiffs' Derivative Duty to Monitor Claims Fails

Count II brings an ERISA § 502(a)(2) claim against Intermountain and the Board for an alleged violation of the "duty to monitor" the BAC. AC ¶¶ 144-50. A failure-to-monitor claim is derivative of an underlying breach of fiduciary duty claim. *See, e.g.*, *Matney*, 80 F.4th at 1159, n. 21. Because Plaintiffs fail to state a claim for breach of fiduciary duty in Count I, Count II fails. *See id.* In addition, Plaintiffs have alleged no facts to support that any monitoring fiduciary breached its duty of *conduct*. Merely alleging a breach is not enough; Plaintiffs must plead facts, which they have not.

## IV.    CONCLUSION

For these reasons, Plaintiffs' AC should be dismissed with prejudice.

DATED:  October 3, 2025

*/s/ Richard J. Pearl*
David Castleberry (USB # 11531)
*david.castleberry@ogletreedeakins.com*
OGLETREE DEAKINS
15 West South Temple Street, Suite 950
Salt Lake City, UT 84101
Telephone: 801-658-6160

Richard J. Pearl (*pro hac vice*)
*rick.pearl@faegredrinker.com*
FAEGRE DRINKER BIDDLE & REATH LLP
320 S. Canal Street., Suite 3300
Chicago, IL 60606
Telephone: 312-213-0056

Allison S. Egan (*pro hac vice*)
*allison.egan@faegredrinker.com*
FAEGRE DRINKER BIDDLE & REATH LLP
1 Logan Square, Suite 2000
Philadelphia, PA 19103
Telephone: 215-988-1982

*Attorneys for Defendants*

26

# CERTIFICATE OF SERVICE

I, Richard J. Pearl, hereby certify that on October 3, 2025, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which sent notification of such filing to all counsel of record.

/s/ Richard J. Pearl
Richard J. Pearl