IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| SHERI JOHNSTON; AUTUMN WIDDOES; SARA HURST; PHILIP WINTERS; LEZETTE RUSCH; and BRYANT THACKER, individually and on behalf of all others similarly situated,<br><br>　　　Plaintiffs,<br><br>v.<br><br>INTERMOUNTAIN HEALTHCARE, INC.; THE BOARD OF DIRECTORS INTERMOUNTAIN HEALTHCARE, INC.; THE INTERMOUNTAIN HEALTHCARE BENEFITS ADMINISTRATION COMMITTEE; and JOHN DOES 1–20,<br><br>　　　Defendants. | **MEMORANDUM DECISION AND ORDER GRANTING MOTION TO DISMISS**<br><br>Case No. 1:25-cv-00073-JNP-DAO<br><br>Chief District Judge Jill N. Parrish |

On October 3, 2025, Defendants Intermountain Healthcare, Inc., the Board of Directors of Intermountain Healthcare, Inc., and the Intermountain Healthcare Benefits Administration Committee (collectively, "Defendants") moved to dismiss Plaintiffs' Amended Complaint. ECF No. 37. For the following reasons, the court GRANTS the motion to dismiss.

**BACKGROUND[1]**

Plaintiffs bring a class action pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1109 and 1132, against Defendants for

---

[1] The court recites the facts as alleged in the Amended Complaint. *See* ECF No. 26.

breaching their fiduciary duties and engaging in a prohibited transaction. Defendants are the fiduciaries of certain defined contribution retirement plans ("the Plans"), established pursuant to 29 U.S.C. § 1002(2)(A) and § 1002(34) of ERISA, which enable eligible participants to make tax-deferred contributions from their salaries. ECF No. 26 at 2, 4. As of 2023, the Plans—a 401(k) Plan and a 403(b) Plan—had over $6 billion and over $300 million in assets, respectively. *Id.* ¶ 13. Plaintiffs allege that the Plans thus collectively qualify as a "jumbo plan" in the defined contribution plan marketplace, providing it with substantial bargaining power regarding fees and expenses that were charged against participants' investments. *Id.* ¶¶ 14–15.

The 401(k) Plan includes a fund called the Principal Stability Fund, which is "a proprietary fund of the Plan that consists of fully benefit-responsive synthetic guaranteed investment contracts" ("GICs"). *Id.* ¶ 60. GICs are generally offered to provide plan participants with an option that protects their assets and is shielded from risks of loss, though preservation of principal is not the sole objective of GICs. *Id.* ¶¶ 84, 86. They provide for a guaranteed rate of return, known as the "crediting rate," during a specified period, and they guarantee the principal of the contract. *Id.* ¶ 85. GICs are also referred to as "stable value investments." *Id.* ¶ 84.

As noted, the Principal Stability Fund is specifically a "synthetic GIC." Synthetic GICs are often offered by large plans and are considered to be the least risky of the stable value investments. *Id.* ¶ 87. In a synthetic GIC, the principal is guaranteed by multiple "wrap providers" (or, insurance carriers), and the fund itself owns the fund's underlying assets. *Id.* ¶ 87. In comparison, in "separate account GICs," the underlying funds are held in a separate account. *Id.* ¶ 88. A separate account GIC is considered riskier because there is only one wrap provider to guarantee the principal. *Id.* ¶ 88. But a separate account GIC generally offers higher crediting rates. *Id.* ¶ 88. Lastly, in "general account GICs," funds are held unrestricted in the general account of an insurance carrier. *Id.* ¶ 90.

They are accordingly more vulnerable (as both subject to claims asserted against the insurer and backed by only the one insurer), even compared to separate account GICs, and thus offer the highest crediting rates. *Id.* Plaintiffs allege, however, that all of these stable value products are heavily regulated and that the number of wrap providers and how the underlying assets are owned make little difference to risk profiles in reality. *Id.* ¶¶ 94–95.

Turning to the Plaintiffs' claims, Plaintiffs allege three causes of action. First, Plaintiffs allege that Defendants breached their fiduciary duty of prudence owed to the Plans, to Plaintiffs, and to other participants in the Plans by "failing to objectively and adequately review the Plans' investment portfolio, initially and on an ongoing basis, with due care to ensure that each investment option was prudent, in terms of performance." *Id.* ¶ 11. They assert that Defendants selected and maintained an underperforming investment option, the Principal Stability Fund, that allegedly "carried significantly more risk" than other investment options with similar goals. *Id.* ¶¶ 22, 83. In 2019, over $280 million of the 401(k) Plan's assets were invested in the Principal Stability Fund. *Id.* ¶ 61. By the end of 2023, over $301 million was invested. *Id.* ¶ 62. Plaintiffs allege that throughout the class period, identical or substantially identical stable value funds with higher crediting rates were available but were not selected by Defendants.

Second, Plaintiffs allege that Intermountain, through its Board, failed to monitor the Committee to ensure that the Committee was adequately performing its fiduciary obligations. *Id.* ¶¶ 146, 147.

Finally, Plaintiffs allege that Defendants caused the Plans to enter into an arrangement with T. Rowe Price Retirement Plan Services, Inc. ("TRP"), allegedly a party in interest, in which TRP was excessively paid for recordkeeping and trustee services in addition to receiving indirect compensation from the Plans in the form of revenue share. *Id.* ¶¶ 19, 116. Plaintiffs allege this

arrangement is a prohibited transaction pursuant to 29 U.S.C. §§ 1106(a)(1)(C) and (D). They specifically allege that the Plans were paying higher recordkeeping fees than their peers. *Id.* ¶ 130. According to the Amended Complaint, the 401(k) Plan's $34 per participant fee from 2019 to 2023 was greater than the average fee of $22 per participant for the same time period for twenty-four comparator plans Plaintiffs analyze. *Id.* ¶ 131.

On October 3, 2025, Defendants moved to dismiss Plaintiffs' Amended Complaint. ECF No. 37. Plaintiffs oppose the motion. ECF No. 42. The Stable Value Investment Association ("SVIA") also filed an amicus brief supporting Defendants' motion to dismiss.[2] ECF No. 41.

## LEGAL STANDARD

"The Supreme Court has held the familiar Rule 12(b)(6) pleading standard applies to breach of fiduciary duty claims under ERISA." *Matney v. Barrick Gold of N. Am.*, 80 F.4th 1136, 1144 (10th Cir. 2023) (citing *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 425–26 (2014)). Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a court may dismiss a complaint if it fails "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).

When considering a motion to dismiss for failure to state a claim, a court "accept[s] as true all well-pleaded factual allegations in the complaint and view[s] them in the light most favorable to the plaintiff." *Burnett v. Mortg. Elec. Registration Sys., Inc.*, 706 F.3d 1231, 1235 (10th Cir.

---

[2] While the court initially granted leave for SVIA to file its amicus brief, the court ultimately did not find it necessary to consider the brief in deciding the motion.

2013). However, a court "'need not accept [t]hreadbare recitals of the elements of a cause of action [that are] supported by mere conclusory statements.'" *Matney*, 80 F.4th at 1144 (quoting *Clinton v. Sec. Benefit Life Ins. Co.*, 63 F.4th 1264, 1275 (10th Cir. 2023)) (citation modified).

ANALYSIS

Defendants argue that each of Plaintiffs' claims—breach of the duty of prudence, breach of the duty to monitor, and a prohibited transaction—should be dismissed. The court addresses each in turn.

## I.    Breach of the Duty of Prudence

An ERISA fiduciary "must select prudent investments from the beginning and has a 'continuing responsibility for oversight of the suitability of the investments already made.'" *Matney v. Barrick Gold of N. Am.*, 80 F.4th 1136, 1146 (10th Cir. 2023) (quoting *Tibble v. Edison Int'l*, 575 U.S. 523, 529 (2015)). Accordingly, "[a] plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones." *Matney*, 80 F.4th at 1146 (quoting *Tibble*, 575 U.S. at 530). Nevertheless, courts are sensitive to the fact that "the circumstances facing an ERISA fiduciary will implicate difficult tradeoffs, and courts must give due regard to the range of reasonable judgments a fiduciary may make based on her experience and expertise." *Hughes v. Nw. Univ.*, 595 U.S. 170, 177 (2022). The "appropriate inquiry" will therefore "necessarily be context specific." *Id.* (quoting *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 425 (2014)). "Ultimately, the duty 'requires prudence, not prescience.'" *Matney*, 80 F.4th at 1146 (quoting *DeBruyne v. Equitable Life Assur. Soc'y*, 920 F.2d 457, 465 (7th Cir. 1990)). This requires the plaintiff to plead facts that "create[] a plausible inference that the decision-making process itself was flawed." *See Matney*, 80 F.4th at 1158 (quoting *Matousek v. MidAmerican Energy Co.*, 51 F.4th 274, 280 (8th Cir. 2022)).

5

The Tenth Circuit has adopted the Eighth Circuit's articulation of the pleading burden facing a plaintiff when bringing a duty of prudence claim. *Matney*, 80 F.4th at 1148 (citing to *Meiners v. Wells Fargo & Company*, 898 F.3d 820, 822 (8th Cir. 2018)). Following this standard, "there is no doubt a claim for breach of ERISA's duty of prudence can be based on allegations that the fees associated with the defined-contribution plan are too high compared to available, cheaper options." *Matney*, 80 F.4th at 1148. But, as the Eighth Circuit held in in *Meiners v. Wells Fargo & Company*, "[t]o show that 'a prudent fiduciary in like circumstances' would have selected a different fund based on the cost or performance of the selected fund, a plaintiff must provide a sound basis for comparison—a meaningful benchmark." 898 F.3d at 822. This meaningful benchmark requirement must be met for there to be "an inference of imprudence through price disparity." *Matney*, 80 F.4th at 1148.

In *Matney*, the Tenth Circuit explained that a plaintiff cannot simply allege that a cost disparity exists. *Id.* at 1149. Instead, "the complaint must state facts to show the funds or services being compared are, indeed, comparable. The allegations must permit an apples-to-apples comparison." *Id.* When it came to comparing investment management fees, the Tenth Circuit found that "a meaningful comparison will be supported by facts alleging, for example, the alternative investment options have similar investment strategies, similar investment objectives, or similar risk profiles to the plan's funds." *Id.* at 1148.

The plaintiff in *Matney* compared certain mutual funds to certain "collective trusts," alleging that the "investments in the collective trusts [were] identical to those held by the mutual fund, except they cost[ed] less." *Id.* at 1153. The Tenth Circuit found that this sort of conclusory allegation was insufficient to establish their comparability, especially when no allegations clarified whether "the goals or strategies of . . . the [collective trusts]" were similar. *Id.* The plaintiff also

compared the mutual funds at issue to other managed funds. *Id*. But again, the Tenth Circuit found the plaintiff had only alleged these funds were comparable in a conclusory fashion, without supporting the allegation with any facts. *Id.* It again reiterated that a "'side-by-side comparison of how two funds performed . . . with no consideration of their distinct objectives'" was "unhelpful for determining which is the more prudent choice." *Id.* at 1154 (quoting *Smith v. CommonSpirit Health*, 37 F.4th 1160, 1167 (6th Cir. 2022)).

Ultimately, the Tenth Circuit held that a plaintiff must properly allege that the different investment options are "similar enough" to the contested option. *Matney*, 80 F.4th at 1154. This does not require an identical comparator, but the comparator must have more than just some similarities. *See id.* (citing to *Meiners* for the proposition that "it is insufficient to allege 'that cheaper alternative investments with *some* similarities exist in the marketplace'" (emphasis in original)).

Defendants argue that Plaintiffs fail to meet their pleading burden of identifying a meaningful benchmark because the comparators in the Amended Complaint are not similar with respect to key characteristics. ECF No. 37 at 9. Defendants assert that the Amended Complaint in fact "alleges that the comparators have several different key characteristics that affect strategy, objective, and risk" but "attempt[s] to gloss over these fundamental differences by focusing on some *superficial* similarities." *Id.* (emphasis in original); *see id.* at 19 (same).

For example, Defendants assert that the Principal Stability Fund is the only fund in the complaint that is guaranteed by multiple wrap providers. *See id.* at 14. In other words, Defendants assert it is the only synthetic GIC, which the complaint itself alleges is often considered the least risky of the stable value investments and accordingly offers lower crediting rates. *See* ECF No. 26

¶¶ 86–87. Defendants therefore argue that the alleged comparators have "fundamental differences in investment style and risk" that preclude their use as meaningful benchmarks. ECF No. 37 at 20.

In response, Plaintiffs contest both (1) that investment strategy and risk profiles are the only relevant characteristics when considering if a comparator is meaningfully similar and (2) that the Amended Complaint does not allege any synthetic GIC comparators.

With respect to this first point, Plaintiffs highlight several other characteristics that they argue, when considered together, can identify meaningful comparators. They state that the Principal Stability Fund's crediting rates can be compared to those of traditional GICs, collective investment trusts, fixed annuity contracts, and other stable value funds of GICs: "(1) [whose terms are] fully benefit-responsive, (2) [that] do not permit the insurance companies to terminate the agreements before the end of the contract, (3) whose rates are reviewed regularly, and (4) whose contracts are with creditworthy insurance carriers." ECF No. 26 ¶ 102. They also contend that another characteristic to consider is whether the managers of an investment option do not believe that there are any events jeopardizing the ability to transact at the contract value. ECF No. 42 at 9–10; ECF No. 26 ¶ 101.

Plaintiffs argue that the Amended Complaint includes comparisons to investment instruments that have all of those similarities. *See* ECF No. 42 at 10 ("The [Amended Complaint] includes several Comparator GICs . . . that meet this criteria . . . .").

The court does not find that these comparators—those that share the criteria identified by Plaintiff but are not synthetic GICs like the Stability Fund—are capable of providing a meaningful benchmark. The court need not opine on the validity, usefulness, or general relevance of Plaintiffs' proffered similarities to reach this conclusion. Instead, the court finds that even if those similarities do indeed exist and are relevant, the characteristics identified by Defendants—investment strategy

and risk profile—are necessary to identify meaningful comparators in this context. Just as in *Matney*, where the court found that investment objectives, investment strategies, and risk profiles were important when comparing the investment management fees of managed funds to those of collective trusts and other managed funds, so too does the court find those characteristics important here in comparing the crediting rates of the Principal Stability Fund to those of various other types of investment instruments. *Matney*, 80 F.4th at 1148.

Plaintiffs respond that the characteristics considered in *Matney* "do not fit squarely with GICs" because GICs are "defined by their predictability[,] . . . offer a set return on investment, and their associated risk level is a creature of their structural design rather than their investment strategy . . . ." ECF No. 42 at 24.  They also argue that GICs "all 'provide the same benefits and expectations of returns.'" *Id.* (quoting *Payne v. Hormel Foods Corp.*, No. 24-CV-545 (SRN/DTS), 2024 WL 4228613, at *7 (D. Minn. Sept. 18, 2024)). Plaintiffs further attempt to discount the differences between GIC types by alleging in the Amended Complaint that (1) when the insurance carrier is the same company as the plan sponsor, the risk is "comparable to synthetic stable value funds because the company owns the assets" (ECF No. 26 ¶ 92); (2) "the number of wrap providers in a GIC is a distinction without a difference in terms of risk, particularly for the comparator GICs . . ., who all have creditworthy insurance carriers" (*id.* ¶ 94); and (3) it "makes little difference to participants whether the plan or the insurance carriers own the underlying assets" (*id.* ¶ 95).

But none of these allegations or arguments alter the fact that the Amended Complaint also includes allegations explaining that synthetic GICs generally have lower crediting rates because of the structural differences in the in-built risk profiles. *See* ECF No. 26 ¶¶ 87–88. Indeed, the allegations minimizing the differences between different types of GICs speak more towards the relative virtues of a synthetic GIC compared to other GICs in terms of *actual, practical risk*. They

do not, however, speak to why it would be appropriate to compare the crediting rates of a synthetic GIC to other instruments that have *structurally different in-built risk profiles* that directly affect the crediting rates provided. *See also Lalonde v. Massachusetts Mut. Ins. Co.*, 728 F. Supp. 3d 141, 156 (D. Mass. 2024) ("As a general matter, 'plans are under no duty to offer any particular type or mix of funds,' so the mere fact Defendants offered the GIA but not the SAGIC is insufficient to plausibly allege breach.").

When basing a claim on crediting rates that are allegedly too low, a plaintiff is reasonably expected under *Matney*'s pleading burden to point to comparators that share the characteristics that directly correlate to the offered crediting rates—as alleged here, the number of guarantors and whether the fund owns the assets. Otherwise, a comparison will not be meaningful; it will be comparing apples to oranges.

The court acknowledges that Plaintiffs cite to authorities that have found, for example, that separate account GICs could serve as meaningful comparators for a contested general account GIC. *See, e.g.*, *Payne*, No. 24-CV-545 (SRN/DTS), 2024 WL 4228613, at *7; *Lacrosse v. Jack Henry & Assocs., Inc.*, No. 23-CV-05088-SRB, 2024 WL 3564575, at *3 (W.D. Mo. July 11, 2024). While these cases are not binding on this court, it is worth noting they are distinguishable. For example, in *Lacrosse*, the court based its decision on the fact that the pleadings alleged that the different GICs provided the same benefits and expectation of returns. *Lacrosse*, No. 23-CV-05088-SRB, 2024 WL 3564575, at *3; *Payne*, No. 24-CV-545 (SRN/DTS), 2024 WL 4228613, at *7 (similar). Here, the Amended Complaint specifically alleges that the different GICs generally provide different benefits in the form of higher or lower crediting rates, based on their risk profiles.

Plaintiffs attempt to identify two other characteristics that they believe make at least some of their comparators meaningfully similar to the Principal Stability Fund. Plaintiffs assert that their

comparators include "GICs with the same issuers" as the Principal Stability Fund (GICs in the Pomona, Baylor College of Medicine, Valley Children's Hospital, and International Imaging Materials plans)[3] and those that are of "the type of GICs the Plans' own documents insist the Principal Stability Fund be compared against" (GICs in the Mattel, Trugreen, Allina, and International Imaging Materials plans). ECF No. 42 at 8, 10.

Alleging that some of these comparators are guaranteed by one of the same insurance carriers as the Principal Stability Fund, as Plaintiffs do, is not enough to show they are meaningful comparators. Again, what is much more central to crediting rates, as defined by the Amended Complaint, is whether those comparators are also guaranteed by multiple insurance carriers.

Plaintiffs' second group of alleged comparators also does little work. They point to case law in which courts have found that where a fund identifies a comparator in its own documents, that comparator is a meaningful and appropriate benchmark. *See* ECF No. 42 at 26–27. But this case is distinguishable from the cases Plaintiffs cite. In those cases, courts relied on specific, prescribed internal benchmarks that are identified by the contested funds often within documents like Investment Policy Statements ("IPSs"). *See, e.g.*, *Trauernicht v. Genworth Fin. Inc.*, No. 3:22CV532, 2023 WL 5961651, at *13 (E.D. Va. Sept. 13, 2023) (noting "Genworth's own IPS provides the S&P Target Date Index as a benchmark"); *Thomson v. Caesars Holdings Inc.*, 661 F. Supp. 3d 1043, 1058 (D. Nev. 2023) (noting allegations that "each [of RITC's] age-based fund[s] underperformed [RITC's internal] custom benchmark[s]"); *Schissler v. Janus Henderson US*

---

[3] Plaintiffs' response asserts that there are four comparators that fit this group but only lists three. *See* ECF No. 42 at 10. Based on the Amended Complaint, it appears that the fourth comparator is the Pomona plan. *See* ECF No. 26 at 28, 31 (flagging the Pomona plan with an asterisk, which the Amended Complaint uses to signify the use of the same insurance carrier as a GIC underlying the Principal Stability Fund).

*(Holdings) Inc.*, No. 1:22-CV-02326-RM-SBP, 2023 WL 6902050, at *5 n.6, *20 (D. Colo. Sept. 7, 2023), *report and recommendation adopted*, No. 22-CV-02326-RM-SBP, 2024 WL 233141 (D. Colo. Jan. 22, 2024) (finding that benchmarks identified in Form 497K summary prospectuses were meaningful comparators); *Jones v. DISH Network Corp.*, No. 22-CV-00167-CMA-STV, 2023 WL 7458377, at *8, *10 (D. Colo. Nov. 6, 2023), *report and recommendation adopted*, No. 22-CV-00167-CMA-STV, 2023 WL 8170913 (D. Colo. Nov. 24, 2023) (noting comparators identified by the IPS or by a Plan's investment advisor were meaningful benchmarks). Here, however, Plaintiffs do not point to any self-prescribed benchmark of the Principal Stability Fund. Rather, they point to one statement in a Form 5500 that, when viewed in context, does nothing more than describe synthetic GICs in a general way.[4] *See* ECF No. 26 ¶ 99 ("Synthetic GICs simulate the performance of traditional guaranteed investment contracts through the use of commingled trust funds, short-term investment funds and benefit-responsive wrapper contracts issued by insurance companies to provide market and cash flow protection at stated interest rates."). It does not set out a prescribed benchmark that the Plan is using to measure its performance. Accordingly, Plaintiffs' contention that the Principal Stability Fund considers it appropriate to compare its performance to traditional GICs and thus that the non-synthetic GICs are meaningful comparators falls flat.

---

[4] The Amended Complaint refers to the Auditor's Report, attached to the 2019 Form 5500 for the 401(k) Plan. *See* ECF No. 26 ¶ 99. The court views this reference as central to the Plaintiffs' claim, and it also appears that no party disputes the Form's authenticity. The court can thus properly consider the document in addition to the portions included in the Amended Complaint. *See Matney v. Barrick Gold of N. Am.*, 80 F.4th 1136, 1150 n.11 (10th Cir. 2023) ("A court may consider (1) 'documents that the complaint incorporates by reference,' (2) 'documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity,' and (3) 'matters of which a court may take judicial notice.'" (citing *Gee v. Pacheco*, 627 F.3d 1178, 1186 (10th Cir. 2010)).

Having found that these alleged comparators are insufficient for a meaningful benchmark, the court considers Plaintiffs' remaining comparators. Plaintiffs assert that the Amended Complaint references "several synthetic GICs like the Stability Fund . . . ." ECF No. 42 at 8. Plaintiffs also assert that the Amended Complaint has at least four pages which describe "these precise types of GICs" as comparators. ECF No. 42 at 25.

Identifying the "several synthetic GICs" in the briefing is not a simple task, however. The four referenced pages of the Amended Complaint describe a variety of types of GICs, not just synthetic GICs. *See* ECF No. 26 at 25–28. Plaintiffs also elsewhere refer to their comparators as "numerous GICs in the same investment category," rather than numerous synthetic GICs. ECF No. 42 at 25. Ultimately, Plaintiffs in their briefing only specifically list "Four Stable Value GICs" (GICs in the Pomona, Gemba Group, Holzer Health System, and the Transamerica 401(k) plans), as opposed to four *synthetic* GICs. ECF No. 42 at 10.

Plaintiffs' various and often competing classifications of their own comparators in their briefing reflects the Amended Complaint's lack of clarity on this point. The Amended Complaint lists fourteen potential comparators. *See* ECF No. 26 ¶ 105. As Plaintiffs assert in their response, four of these could be considered as "Stable Value GICs," which the court takes to mean synthetic GICs: GICs in the Pomona, Gemba Group, Holzer Health System, and the Transamerica 401(k) plans. But the Amended Complaint only explicitly alleges that the Pomona and Gemba Group plans offered synthetic GICs. *Id.* As it appears to the court, the Amended Complaint's allegations relating to the Holzer Health System plan do not suggest that its GIC is guaranteed by multiple insurance carriers, which the Amended Complaint defines as a necessary element for a synthetic GIC. Similarly, while the Transamerica plan description notes that the GIC offered has stable fund

13

segments with guaranteed rates of interests "like a Synthetic GIC," the complaint does not allege that it is a synthetic GIC or that it is guaranteed by multiple insurance carriers. *Id.*

The court is thus left with two alleged synthetic GIC comparators: GICs in the Pomona and Gemba Group plans. But the Amended Complaint then proceeds to undercut the Pomona GIC's classification by listing it as having only one insurance carrier. *See* ECF No. 26 at 31. The Amended Complaint does, however, identify two insurance carriers for the Gemba Group GIC. *See id.* at 30. Viewing the Amended Complaint in the light most favorable to Plaintiffs, the court considers both comparators as capable of providing a meaningful benchmark. *See Clinton v. Sec. Benefit Life Ins. Co.*, 63 F.4th 1264, 1275 (10th Cir. 2023) (discussing the motion to dismiss standard).

But just having a meaningful benchmark is not enough to plead a plausible duty of prudence claim. Rather, the plaintiff must also plead facts that "create[] a plausible inference that the decision-making process itself was flawed." *See Matney*, 80 F.4th at 1158 (quoting *Matousek v. MidAmerican Energy Co.*, 51 F.4th 274, 280 (8th Cir. 2022)).

The limited data points provided in the Amended Complaint relating to the two surviving comparators are insufficient to give rise to such a plausible inference. Overall, the Amended Complaint compares the Principal Stability Fund's crediting rates to those of the fourteen comparators from 2019 to 2023, alleging "[t]hat throughout the Class Period, the Stability Fund in the Plans underperformed the comparator funds by an average of almost 45% . . . ." ECF No. 26 ¶ 107. For each year in this range, the Amended Complaint averages the crediting rates of four to six of the fourteen comparators, comparing that average crediting rate to the Stability Fund's crediting rate that year. *Id.* ¶ 106. Frankly, the court would be suspect of this methodology even if all fourteen comparators were meaningfully similar. Indeed, Plaintiffs do not compare the Stability

Fund's performance to any one comparator in a consistent fashion. Instead, it appears that Plaintiffs cherry-pick a handful of crediting rates from the fourteen comparators for each year.

Looking to just the Pomona and Gemba GICs, the inadequacy of the methodology becomes even more striking. The Amended Complaint only provides two data points for the Gemba plan, both for 2021. *Id.* Only one data point is provided for the Pomona plan, for 2023. *Id.* Two one-year snapshots are patently insufficient in meeting even the low bar Plaintiffs are up against—raising a plausible inference that Defendants were imprudent or that their decision-making process was flawed. *See Macias v. Sisters of Charity of Leavenworth Health System, et al.*, No. 23-CV-01496-LTB-SBP, 2025 WL 4095840, at *6 (D. Colo. Jan. 6, 2025) (finding that cherry picked data points could not support an inference of imprudence); *England v. DENSO Int'l Am., Inc.*, No. 22-11129, 2023 WL 4851878, at *9 (E.D. Mich. July 28, 2023) ("The two-year snapshot of underperformance is insufficient to plausibly plead that the investment should never have been selected, became imprudent over time, or was otherwise unsuitable for the goals of the fund."); *Smith v. CommonSpirit Health*, 37 F.4th 1160, 1166 (6th Cir. 2022) ("Merely pointing to another investment that has performed better in a five-year snapshot of the lifespan of a fund that is supposed to grow for fifty years does not suffice to plausibly plead an imprudent decision . . . that breaches a fiduciary duty.").

Moreover, the Amended Complaint does not plead sufficient allegations for the court to infer anything about the "decision-making process itself." *See Matney*, 80 F.4th at 1158. Plaintiffs attempt to point to portions of the Amended Complaint that they view as discussing process rather than simple underperformance. *See* ECF No. 42 at 11, 20–23. They argue that the allegations support an inference that Defendants failed to investigate the prevailing marketplace, failed to negotiate better rates, and failed to follow their own defined processes. *Id.* These allegations,

15

however, rely on Plaintiffs' underperformance theories, and the court has already found Plaintiffs' underperformance allegations insufficient to raise any relevant plausible inference.

The court accordingly finds that Plaintiffs' Amended Complaint does not plausibly allege a duty of prudence claim.

## II.    Breach of the Duty to Monitor

Plaintiffs concede that their duty to monitor claim is derivative of their duty of prudence claim. ECF No. 42 at 31. Because the court finds that Plaintiffs have not plausibly alleged their duty of prudence claim, it similarly finds Plaintiffs have not plausibly alleged their duty to monitor claim. *See Matney v. Barrick Gold of N. Am.*, 80 F.4th 1136, 1158–59 (10th Cir. 2023).

## III.    Prohibited Transaction

"ERISA prohibits certain transactions between fiduciaries and third parties." *Ramos v. Banner Health*, 1 F.4th 769, 785 (10th Cir. 2021) (citing *Teets v. Great-W. Life & Annuity Ins. Co.*, 921 F.3d 1200, 1207 (10th Cir. 2019)). "Specifically, ERISA prohibits a plan's fiduciary from 'engag[ing] in a transaction, if he knows or should know that such transaction constitutes a direct or indirect . . . furnishing of goods, services, or facilities between the plan and a party in interest.'" *Ramos*, 1 F.4th at 785–86 (quoting 29 U.S.C. § 1106(a)(1)(C)). It also prohibits a fiduciary from causing a plan to engage in a transaction that the fiduciary "knows or should know . . . constitutes a direct or indirect . . . transfer to, or use by or for the benefit of a party in interest, of any assets of the plan[.]" 29 U.S.C. § 1106(a)(1)(D). "Under ERISA, a 'party in interest' includes 'a person providing services to such plan.'" *Ramos*, 1 F.4th at 786 (quoting 29 U.S.C. § 1002). "A plan participant can sue a fiduciary who engages in such a prohibited transaction." *Ramos*, 1 F.4th at 786 (citing to 29 U.S.C. § 1132(a)(1)).

In the Amended Complaint, Plaintiffs allege that during the class period, Defendants entered into a contract with TRP to provide recordkeeping and administrative services to the Plans. ECF No. 26 ¶ 114. They further allege that TRP was a party in interest to the Plans because it was "receiving compensation for [recordkeeping and administrative] services, as well as indirect compensation from the Plans in the form of revenue share being paid to TRP from TRP funds in the Plan." ECF No. 26 ¶ 116. They allege that the contract with TRP was thus a prohibited transaction.

Defendants put forward numerous arguments as to why they believe this claim should be dismissed. The court addresses each in turn.

First, they argue that the prohibited transaction claim is time-barred because, as Defendants contend, Plaintiffs had actual knowledge that the Plans transacted with TRP as recordkeeper for more than three years before they sued. ECF No. 37 at 30 (citing 29 U.S.C. § 1113(2)). Defendants argue Plaintiffs thus had the requisite knowledge to start the clock on ERISA's three-year statute of limitations. ECF No. 37 at 10. According to Defendants, this is clear on the face of the Amended Complaint. ECF No. 37 at 31 (citing *PHH Mortg. Corp. v. Stuber*, 766 F. Supp. 3d 1162, 1169 (D. Kan. 2025) ("To resolve a statue of limitations issue on a motion to dismiss, the Court must find that the face of the complaint makes the answer 'apparent.'")).

To support their reading of the Amended Complaint, Defendants point to two allegations. First, Plaintiffs' allegation that TRP was the recordkeeper throughout the class period. ECF No. 26 ¶ 114. Second, Plaintiffs' allegation that the class period began on June 3, 2019. *Id.* ¶ 51. Defendants believe these two allegations show that Plaintiffs knew as early as June 3, 2019, that TRP was the Plan's recordkeeper. ECF No. 37 at 31. Accordingly, Defendants believe the statute of limitations period ran through June 3, 2022. *Id.*

Plaintiffs respond by arguing that Defendants conflate constructive knowledge that a transaction occurred with the standard of actual knowledge required in a prohibited transaction claim under ERISA. ECF No. 42 at 8. Plaintiffs point to *Intel Corp. Inv. Pol'y Comm. v. Sulyma* in support of their position. 589 U.S. 178 (2020).

In *Sulyma*, the Supreme Court described that "[u]nder § 1113(2), suit must be filed within three years of 'the earliest date on which the plaintiff had actual knowledge of the breach or violation.'" *Id.* at 181. The court held that to "meet § 1113(2)'s 'actual knowledge' requirement, however, the plaintiff must in fact have become aware of that information." *Id.* at 186–87. This standard "requires more than evidence of disclosure alone." *Id.* at 186. The statute of limitations period "begins only when a plaintiff actually is aware of the relevant facts, not when he should be." *Id.* at 187.

The allegations in the complaint do not make it apparent that Plaintiffs had actual knowledge of the violation as early as June 3, 2019. The allegations Defendants rely on show that Plaintiffs have certain relevant information, but they do not show *when* Plaintiffs acquired that information. In fact, Plaintiffs allege that "Plaintiffs did not have knowledge of all material facts necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed." ECF No. 26 ¶ 39; *see also id.* ¶ 77 ("Plaintiffs did not have and do not have actual knowledge of the specifics of Defendants' decision-making process with respect to the Plans, including Defendants' processes (and execution of such) for selection, monitoring, and removing the Plans investments and fees because this information is solely within the possession of Defendants prior to discovery."). At this stage, the court must accept as true that Plaintiff only learned of all material facts shortly before this suit was filed. *See, e.g.*, *Moreno v. Deutsche Bank Americas Holding Corp.*, No. 15 CIV. 9936

18

(LGS), 2016 WL 5957307, at *4 (S.D.N.Y. Oct. 13, 2016) (finding the same); *Kohari v. MetLife Grp., Inc.*, No. 21 CIV. 6146 (JPC), 2022 WL 3029328, at *6 (S.D.N.Y. Aug. 1, 2022) (finding the same).

The court next considers Defendants' second and third arguments in tandem. As to the second argument, Defendants contend that Plaintiffs have not sufficiently plead their claim because they failed to state "that 'the recordkeeping services rendered by the chosen comparators are similar to the services offered by the plaintiff's plan.'" ECF No. 37 at 14 (quoting *Matney v. Barrick Gold of N. Am.*, 80 F.4th 1136, 1148 (10th Cir. 2023)). They assert that Plaintiffs did not allege any information about the actual services the different comparator plans received and that the comparators, at least for the 403(b) Plan, are too dissimilar to support a claim of imprudence. ECF No. 37 at 15, 26.

As to the third argument, Defendants contend that Plaintiffs must not only plead a fiduciary breach but also that the breach caused damages and that the relief they seek is available. *Id.* at 29. Thus, Defendants assert that even if "Plaintiffs have adequately alleged that the Plans' arrangements with TRP were technically prohibited transactions, [Plaintiffs] have failed to allege the recordkeeping arrangements caused the Plans any losses." *Id.* at 29. Defendants argue that "[a]s a matter of law, Plaintiffs cannot state a claim for excessive recordkeeping fees when the amount paid has been cited in countless cases as *the* supposed goal for reasonable recordkeeping fees, notwithstanding Plaintiffs' cherrypicked, dissimilar plans." *Id.* at 10 (emphasis in original). In other words, they allege Plaintiffs have failed to plead "causation of injury[] because the amount of fees was reasonable on its face." *Id.*

Both of Defendants' final arguments rely on the premise that a plaintiff cannot state a claim under ERISA merely by alleging a prohibited transaction. ECF No. 43 at 5. They assert that a

19

plaintiff must proceed under one of the causes of action listed in Section 1132(a) and that, under Section 1132(a)(2), a plaintiff must plead a breach of a fiduciary duty, losses to an ERISA plan, and in some courts, causation. *Id.* at 7–8.

Plaintiffs respond that Defendants mistake their prohibited transactions claim for a fiduciary breach claim. Plaintiffs argue that "the excessive [recordkeeping and administrative fees] incurred by Plaintiffs and the Plan, traceable to the prohibited transaction, demonstrates Article III injury, *not loss*,"—relevant for standing. ECF No. 42 at 8 (emphasis in original). Plaintiffs continue that "[a]lthough the fee comparisons would suffice under *Matney*, the standing inquiry is not a merits inquiry and there is no meaningful benchmark requirement in prohibited transaction claims[.] A prohibited transaction claim[] survives dismissal even if the [recordkeeping and administrative fee] comparisons are found to be implausible." *Id.* In other words, Plaintiffs argue that "[e]xcessive fees, let alone excessive fees in relation to services rendered, are not pleading requirements in prohibited transaction cases, unlike fiduciary breach cases." *Id.* at 11.

The court agrees with Defendants that ERISA's causes of actions are detailed in § 1132(a).[5] *See Aetna Health Inc. v. Davila*, 542 U.S. 200, 216 (2004) ("Congress' intent to make the ERISA civil enforcement mechanism exclusive would be undermined if state causes of action that supplement the ERISA § [1132](a) remedies were permitted . . . ."); *Wall v. Reliance Standard Life Ins. Co.*, No. 20-CV-2075 (EGS/GMH), 2022 WL 17976806, at *8 (D.D.C. Nov. 8, 2022) ("Section 502 of ERISA—also known as 29 U.S.C. § 1132—enumerates the bases on which a civil

---

[5] To support the proposition that ERISA's exclusive list of authorized causes of action are only found in Section 1132(a), Defendants first cite to the dissent in *Varity Corp. v. Howe*, 516 U.S. 489, 519 (1996). Defendants notably do not state they are citing to the dissent. *See* ECF No. 43 at 7. They also point to *Massachusetts Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 147 (1985).

action may be brought under the statute."); *In re Lehman Bros. Sec. & ERISA Litig.*, No. 09 MD 2017 LAK, 2012 WL 6013012, at *1 (S.D.N.Y. Dec. 3, 2012) ("ERISA § [1132] sets forth the exclusive causes of action available under ERISA."). But this conclusion only advances Defendants' argument so far. Plaintiffs, for their part, state in the Amended Complaint that, *pursuant to § 1132(a)(2)*, Defendants are liable for all losses caused by their violations of § 1106(a)(1)—the statutory section relevant to prohibited transactions. ECF No. 26 ¶ 156.

But Defendants then go a step further, asserting that under § 1132(a)(2), the plaintiff must plead "(1) the defendant had, and breached, a fiduciary duty; (2) losses to an ERISA plan; and in some courts, (3) causation." ECF No. 43 at 8. Relevant here, Section 1132(a)(2) cites to § 1109, "Liability for breach of fiduciary duty." *See* 29 U.S.C. § 1132(a)(2) (citing 29 U.S.C § 1109).

Defendants, however, point to no binding precedent supporting their specific proposition that a prohibited transaction claim has this more involved pleading standard. Defendants only cite non-binding, out-of-circuit case law in support. *Id.*; ECF No. 37 at 29. Even these cases, however, do not speak specifically to a pleading requirement for prohibited transaction claims brought pursuant to § 1132(a)(2) for a violation of 1106(a)(1). Nor do they even speak to any mandatory pleading requirements for claims brought specifically under § 1132(a)(2). *See, e.g., Kenseth v. Dean Health Plan, Inc.*, 610 F.3d 452, 464 (7th Cir. 2010) (listing elements for a claim of breach of fiduciary duty generally).[6] In fact, the case law Defendants cite underscores that courts have varied on what they require for § 1132(a) claims at the pleading stage.

---

[6] For example, Defendants assert that the Seventh Circuit in *Kenseth v. Dean Health Plan, Inc.* lists the elements of an ERISA claim under § 1132(a)(2). ECF No. 43 at 8; *see* 610 F.3d 452, 464 (7th Cir. 2010). But while the Seventh Circuit in *Kenseth* recited three elements as broadly applicable to fiduciary breach claims under ERISA (fiduciary duty, breach, and harm), it was specifically considering a claim under § 1132(a)(3). *Kenseth*, 610 F.3d at 464, 482 ("She therefore

While Defendants point to no binding precedent, the court notes that the Tenth Circuit has spoken to a limited degree on this issue. As it stated, "[t]aken together, § 1109(a) creates fiduciary liability, and § 1132(a)(2) allows for its enforcement." *Harrison v. Envision Mgmt. Holding, Inc. Bd. of Directors*, 59 F.4th 1090, 1103 (10th Cir. 2023) (quoting *Smith v. Bd. of Directors of Triad Mfg., Inc.*, 13 F.4th 613, 618 (7th Cir. 2021)). More specifically, the Tenth Circuit has considered what showing is required for liability under § 1109, though not at the pleading stage. It has said that "[i]n order for an ERISA plaintiff to prevail on such a claim, 'there must be a showing of some causal link between the alleged breach . . . and the loss plaintiff seeks to recover.'" *Holdeman v. Devine*, 572 F.3d 1190, 1193 (10th Cir. 2009) (quoting *Allison v. Bank One–Denver*, 289 F.3d 1223, 1239 (10th Cir. 2002)).

This precedent lends some credence to Defendants' argument here, but the Supreme Court's recent decision in *Cunningham v. Cornell University*, which post-dates all of the above case law, changes the analysis. 604 U.S. 693 (2025). *Cunningham* outlined a less demanding pleading standard for prohibited transaction claims. In response, Defendants argue that *Cunningham* did not address § 1132(a); they believe it only spoke to what is considered an adequate allegation of *breach* when it comes to ERISA claims involving prohibited transactions. ECF No. 43 at 8. While it is true that the Supreme Court in *Cunningham* did not specifically address § 1132(a), this court reads *Cunningham* as clearly and comprehensively outlining what is required to plead a prohibited transaction claim—even if brought pursuant to § 1132(a)(2).

---

must be suing under the statute's catch-all provision, section 1132(a)(3)."). The case *Kenseth* relied on for those elements also explicitly considered a claim under § 1132(a)(3), rather than (a)(2). *See Kannapien v. Quaker Oats Co.*, 507 F.3d 629, 639 (7th Cir. 2007) ("Next, Kannapien and Rozhon present ERISA claims for breach of fiduciary duty, also under 29 U.S.C. § 1132(a)(3).").

22

Looking to *Cunningham*, it is worth first considering how the Court framed the issue in the case. As the Court initially stated, the question presented was "whether, to state a claim under [§ 406], a plaintiff must plead that [a certain exemption] does not apply to an alleged transaction between a plan and a party in interest." *Cunningham*, 604 U.S. at 695–96. That question might imply that the Court did not consider the overall pleading requirements of a prohibited transaction claim but rather just the necessity of a certain alleged requirement. But the remainder of the Court's opinion makes its conception of a prohibited transaction claim's pleading requirements clear.

The Court first outlined the case's procedural history. The district court, ruling on a motion to dismiss, found that the plaintiff, "in addition to pleading the prohibited-transaction elements contained within § 1106(a)(1)(C), must also allege 'some evidence of self-dealing or other disloyal conduct.'" *Id.* at 698. The Second Circuit affirmed but based on different reasoning. The Second Circuit held "that a plaintiff alleging a prohibited transaction under § 1106(a)(1)(C) must also allege 'that [the] transaction was unnecessary or involved unreasonable compensation.'" *Id.* at 699. The Court in *Cunningham* noted that the Second Circuit here "split from the Eighth Circuit, which ha[d] held that no additional pleading requirements beyond § 1106(a)(1) apply to prohibited-transaction claims." *Id.* at 700 (citing to *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 600–602 (8th Cir. 2009)). It then stated that the Court granted certiorari "to decide whether a plaintiff *can state a claim for relief by simply alleging that a plan fiduciary engaged in a transaction proscribed by § 1106(a)(1)(C)*, or whether a plaintiff must plead allegations that disprove the applicability of the § 1108(b)(2)(A) exemption." *Cunningham*, 604 U.S. at 700 (emphasis added). The Court concluded "that plaintiffs need do no more than plead a violation of § 1106(a)(1)(C)." *Id.*

The rest of the opinion continues to affirm that a plaintiff can sufficiently plead a prohibited transaction claim by just alleging a prohibited transaction took place. It outlined that §

23

1106(a)(1)(C) (the specific prohibited transaction provision relevant to both *Cunningham* and, in part, this case) contains three elements. The section "prohibits fiduciaries from (1) 'caus[ing a] plan to engage in a transaction' (2) that the fiduciary 'knows or should know . . . constitutes a direct or indirect . . . furnishing of goods, services, or facilities' (3) 'between the plan and a party in interest.'" *Id.* at 700. The Court held that a plaintiff "need only plausibly allege each of those elements." *Id.* Even when confronted with the argument that this standard would allow plaintiffs to "too easily get past the motion-to-dismiss stage," the Court emphasized that those "serious concerns" could not "overcome the statutory text and structure." *Id.* at 708.

This court thus sees no reason to not take the Supreme Court at its word that "plaintiffs seeking to state a § 1106(a)(1)(C) claim must plausibly allege that a plan fiduciary engaged in a transaction proscribed therein, no more, no less." *Id.* at 709; *see Fezer v. Lockheed Martin Corp.*, No. CV 25-0908-TDC, 2026 WL 1041276, at *10 (D. Md. Apr. 16, 2026) (holding the same); *Chrupcala v. Firstrust Sav. Bank*, No. CV 25-6578, 2026 WL 927226, at *6 (E.D. Pa. Apr. 6, 2026) (holding the same for a § 1106(a)(1)(D) claim). And even if *Cunningham* did not explicitly foreclose additional pleading requirements, Defendants point to no case law, and the court finds none, that requires importing additional *pleading* requirements onto a prohibited transaction claim just because it is made pursuant to § 1132(a)(2). After all, prohibited transaction claims can be brought under other provisions of § 1132(a) and against non-fiduciaries, *see Harris Tr. & Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 248 (2000), and the Supreme Court made no effort to restrict its holding in *Cunningham* to a certain element or context. *See Cunningham*, 604 U.S. at 697 ("Section 1106 'supplements the fiduciary's general duty of loyalty to the plan's beneficiaries . . . by categorically barring certain transactions deemed likely to injure the pension plan.'" (citation modified)). Thus, in light of *Cunningham*, the court declines to do so either.

The central question thus becomes whether Plaintiffs plausibly alleged the elements of its §§ 1106(a)(1)(C) and (D) prohibited transaction claims, as identified by *Cunningham*.[7] As stated, § 1106(a)(1)(C) prohibits fiduciaries from (1) "caus[ing a] plan to engage in a transaction" (2) that the fiduciary "knows or should know . . . constitutes a direct or indirect . . . furnishing of goods, services, or facilities" (3) "between the plan and a party in interest." Section 1106(a)(1)(D) prohibits fiduciaries from (1) "caus[ing a] plan to engage in a transaction" (2) that the fiduciary "knows or should know . . . constitutes a direct or indirect . . . transfer to, or use by or for the benefit of a party in interest, of any assets of the plan[.]" A party in interest is defined in part and as relevant here as "a person providing services to such plan." 29 U.S.C. § 1002(14)(B).

Plaintiffs assert that Defendants caused the Plans to enter into a contract with TRP to provide services to the Plans. ECF No. 26 ¶ 19. That contract allowed TRP to receive millions of dollars in exchange for recordkeeping and trustee services. *Id.* Plaintiffs claim TRP was a party in interest to the Plans "as it was receiving compensation for [recordkeeping] services, as well as indirect compensation from the Plans in the form of revenue share being paid to TRP from TRP funds in the Plan." *Id.* ¶ 116; *see id.* ¶ 19 (alleging TRP also "received additional income from certain of the Plans' investment securities"). Plaintiffs allege this transaction resulted in an injury in the form of excessive fees. *Id.* ¶ 136; *see Cunningham*, 604 U.S. at 708 ("District courts must also, consistent with Article III standing, dismiss suits that allege a prohibited transaction occurred

---

[7] Defendants argue this point in passing. *See* ECF No. 37 at 29 ("Thus, even if Plaintiffs have adequately alleged that the Plans' arrangements with TRP were technically prohibited transactions, they have failed to allege the recordkeeping arrangements caused the Plans any losses.").

but fail to identify an injury.").[8]

Plaintiffs thus argue that "Defendants' decision to agree to pay excessive fees to TRP" was a prohibited transaction because it amounted to a direct or indirect furnishing of services between the Plans and a party in interest pursuant to § 1106(a)(1)(C) and the transfer to or use of plan assets for the benefit of a party in interest pursuant to § 1106(a)(1)(D). *Id.* ¶ 155.

Even considering *Cunningham*'s minimal pleading standard, these allegations are insufficient to plausibly state a prohibited transaction claim. The most immediate issue is that Plaintiffs circularly allege that the alleged prohibited transaction they find fault with is the same transaction that caused TRP to be a party in interest. That cannot be so. The statute defines a party in interest as a person providing services to a plan. 29 U.S.C. § 1002(14)(B). When TRP contracted with the Plans to provide its recordkeeping services, it was not yet a party in interest. After all, it was not yet providing services to the Plans, undercutting the § 1106(a)(1)(C) claim. *See Tedford v. Equitable Financial Life Insurance Company, et al.*, No. 25-Cv-2180, 2026 WL 1398640, at *6 (D.N.J. May 19, 2026) (finding the same); *Piercy v. AT&T Inc.*, No. 24-CV-10608-NMG, 2025 WL 2505660, at *44–45 (D. Mass. Aug. 29, 2025), *report and recommendation adopted*, No. CV 24-10608-NMG, 2025 WL 2809008 (D. Mass. Sept. 30, 2025) (finding the same).

This court is bound to this conclusion because the Tenth Circuit in *Ramos v. Banner Health* has held as much. 1 F.4th 769 (2021). In *Ramos*, the court stated that "some *prior relationship* must exist between the fiduciary and the service provider to make the provider a party in interest under § 1106." *Id.* at 787 (emphasis added). It explained this conclusion by underscoring that

---

[8] While Plaintiffs must identify injury for standing purposes, they need not make or prove any specific allegation of unreasonableness at this stage. *See Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 601–02 (8th Cir. 2009).

"ERISA is meant to prevent fiduciaries from engaging in transactions with parties with whom they have pre-existing relationships, raising concerns of impropriety. Otherwise, a plan participant could force any plan into court for doing nothing more than hiring an outside company to provide recordkeeping and administrative services." *Id.* Following the Tenth Circuit's reasoning in *Ramos*, the court also does not believe that payments in the form of fees pursuant to that valid contract would be prohibited under ERISA, undercutting Plaintiffs' § 1106(a)(1)(D) claim. *Tedford*, No. 25-Cv-2180, 2026 WL 1398640, at *6 (finding the same).

However, Plaintiffs do not flag just the fee payments in their complaint. They also highlight the "revenue sharing" arrangement. As a brief explainer, recordkeeping fees can be "charged either as a flat fee, with each fund participant paying a set amount, or by 'revenue sharing,' in which the fund pays the recordkeeper a set portion of the fund's expense ratio." *Cunningham v. Cornell Univ.*, 86 F.4th 961, 969–70 (2d Cir. 2023), *rev'd and remanded on other grounds*, 604 U.S. 693 (2025). In other words, the recordkeeper collects funds from participants' investments to cover either all or "a portion of the costs of services provided." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 590 (8th Cir. 2009). This practice "is not uncommon in the industry." *Id.*

To be clear, Plaintiffs do not allege these revenue sharing payments are prohibited transactions under § 1106(a)(1)(D), unlike plaintiffs in many other cases. *See, e.g.*, *id*. Instead, Plaintiffs here specifically state that the *excessive fees* paid to TRP are prohibited by § 1106(a)(1)(D). ECF No. 26 ¶ 155. Nevertheless, the court finds it prudent to also address why even the revenue share payments could not be plausibly alleged to have violated ERISA in this case and why no binding precedent compels a different conclusion. Simply put, like in the case of the fee payments, the revenue share payments here are made pursuant to a valid, arms-length arrangement.

*Cunningham* does not compel another result. Admittedly, in that case, the Supreme Court considered a similar revenue share payment arrangement. *Cunningham*, 604 U.S. at 698. But as described, the Court was considering whether plaintiffs must plead additional elements for claims under § 1106(a)(1)(C). The Court did not speak to whether the contested transaction in that case could actually pass under the pleading standard the Court outlined; rather, the Court simply remanded the case for further consideration. *Cunningham*, 604 U.S. at 709; *id.* at 708 (stating only "[t]o the extent such transactions fall within the scope of § 1106(a)(1)(C)" when referring to the cases like the one the Court was considering).

Indeed, the Court's pleading standard specifically requires an analysis of whether the party in interest element is met, and the Tenth Circuit's precedent in *Ramos* remains good law and binding on this court, as Plaintiffs agree. *See* ECF No. 46 at 9. After all, *Cunningham* did not purport to define *when* a service provider becomes a party in interest,[9] which is the relevant holding of *Ramos* that this court applies here. Thus, Plaintiffs have failed to plausibly plead a prohibited transaction claim.

**CONCLUSION AND ORDER**

For the above reasons, the court GRANTS Defendants' motion to dismiss the Amended Complaint. ECF No. 37.

---

[9] The court concedes there is some contrary, though non-binding, authority. Justice Alito's concurrence in *Cunningham*, joined by Justices Thomas and Kavanaugh, suggests that anytime a plan administrator employs an outside service provider, the service provider becomes a party in interest and therefore the provision of those same services becomes unlawful under § 1106 unless an § 1108 exception applies. *Cunningham v. Cornell Univ.*, 604 U.S. 693, 710 (2025) (Alito, J., concurring). But as described, the majority opinion does not state as much.

Signed July 10, 2026.

BY THE COURT

Jill N. Parrish
United States Chief District Judge